**DAEWOO MOTOR AMERICA, INC., Plaintiff,**

v.

**GENERAL MOTORS CORP.,** Suzuki Motor Corp., American Suzuki Motor Corp., GM Daewoo Auto & Technology Co., Defendants.

**No. 6:04CV201–ORL–31KRS.**

United States District Court, M.D. Florida, Orlando Division.

Aug. 26, 2004.

Daniel E. Myers, Loula Moore Fuller, Myers & Fuller, P.A., Tallahassee, FL, Joseph F. Coyne, Jr., Kenneth A. O'Brien, Jr., Sheppard, Mullin, Richter & Hampton, Los Angeles, CA, Theodore B. Stolman, Stutman, Triester & Glatt, P.C., Los Angeles, CA, for Plaintiff.

Peter J. Leeson, IV, Kirkland & Ellis, Michael T. Purleski, Stephen T. Owens, Squire, Sanders & Dempsey LLP, A. William Urquhart, David W. Quinto, Quinn, Emanuel, Urquhart & Oliver, Los Angeles, CA, Joseph Donaldson Edwards, Stephen John Mitchell, Squire, Sanders & Dempsey L.L.P., Tampa, FL, R. Benjamin Reid, Carlton Fields, P.A., Miami, FL, Sarah A. Long, Carlton Fields, P.A., Orlando, FL, for Defendants.

Denise Madigan, Los Angeles, CA, pro se.

## ORDER

PRESNELL, District Judge.

This cause comes for the Court's consideration on the following:

1) General Motors Corp.'s ("GM") Motion to Dismiss (Doc. 73), Memorandum in Support thereof (Doc. 121); GM Daewoo Auto & Technology Co.'s ("GMDAT") Supplemental Memorandum (Doc. 127); and American Suzuki Motor Corp.'s ("American Suzuki") Supplemental Memorandum (Doc. 129). In addition, Daewoo Motor America ("DMA") filed a Response (Doc. 138) and Supplemental Brief (Doc. 139), and GM filed a Reply (Doc. 147). GMDAT also filed a Response (Doc. 149).

2) Suzuki Motor Corp.'s ("Suzuki") Motion to Dismiss (Doc. 136) and Memorandum in Support thereof (Doc. 137), and DMA's Response thereto (Doc. 140). In addition, DMA filed a Memorandum in Opposition (Doc. 145), and Suzuki filed a Reply (Doc. 150) and Supplemental Brief (Doc. 151).

The Court heard oral argument on August 20, 2004.

## I. Background

DMA was incorporated in Delaware [1] on June 30, 1997, as a wholly owned subsidiary of Daewoo Motor Co., Ltd. ("DWMC"), a South Korean automobile manufacturer. DMA served as the exclusive distributor of Daewoo automobiles in the United States, and provided exclusive warranty services and replacement parts to U.S. Daewoo dealers. [2]

On November 18, 1999, DMA and DWMC entered into an Automobile Purchase and Distribution Agreement ("the Distribution Agreement"). [3] Under this Agreement, DWMC (the "Seller") agreed to sell to DMA (the "Buyer") certain "Products," and granted to DMA "the exclusive right to distribute, sell, rent, lease and otherwise dispose of and service, directly or through one or more subsidiaries or independent contractors, the Products in the United States and all territories and possessions thereof." (Doc. 144, Ex. 7) (parenthetical information omitted). [4] The Agreement further provided:

1. DMA's principal place of business is in California.

2. DMA entered into Dealer Sales and Services Agreements with numerous dealers nationwide. (See, e.g., Doc. 122, Ex. 3).

3. Prior to the execution of the Distribution Agreement, on January 1, 1998, DMA entered into a Trademark License Agreement ("Trademark Agreement") with DWMC's predecessor in interest. (Doc. 144, Ex. 10). The Trademark Agreement was executed in conjunction with an Original Distribution Agreement that was superceded by the Distribution Agreement. Under the Trademark Agreement, DWMC granted to DMA the non-exclusive right to use the Daewoo trademark in the United States in connection with the sale of Daewoo vehicles and parts. Also on January 1, 1998, DWMC's predecessor in interest entered into a Supply Commitment Agreement ("Supply Agreement") with PPM Finance, Inc. ("PPM"), its principal lender. (Doc. 144, Ex. 9).

4. A copy of the Distribution Agreement was attached to the Declaration of current DMA President Yeong Soo Hong (Doc. 144) as Exhibit 7.

Whereas, Seller is the exclusive worldwide distributor of the Products (as defined in Section 1), which are manufactured by Seller;

Whereas, Seller, as exclusive worldwide distributor has the right to grant to others the exclusive right to sell the products in certain regions, including the Territory (as defined in Section 2);

Whereas, Buyer is the wholly owned subsidiary of Seller;

. . .

... Seller hereby agrees to sell to Buyer and Buyer hereby agrees to purchase from Seller the Products for resale or for rental or lease in the Territory. For purposes of this Agreement, "Products" shall mean the motor vehicles provided on Exhibit A attached hereto (as said Exhibit A may be amended from time to time by Seller to add or delete motor vehicle models) ...

... Seller shall not Sell or service, directly or indirectly, or permit any other person or corporation, partnership, limited liability company or their entity to Sell or service the Products in the Territory.

The Agreement references "Exhibit A," but the parties agree that no such exhibit ever existed and therefore never was "attached."

In the late 1990s, DWMC began to suffer financial hardship. Thus, on November 10, 2000, DWMC filed for protection in Korea under the Korean Corporate Reorganization Act ("CRA"),[5] and the Korean Court appointed a Receiver.

DWMC notified DMA of its insolvency and plans to file for court receivership.

(Doc. 123, Ex. 6). The notification included a summary of Korean bankruptcy law as well as statements indicating that creditors must participate in the reorganization plan to be repaid and that failure to file a claim would result in the loss of that creditor's rights. (*Id.*). DMA in turn notified the U.S. dealers with whom it had Dealer Agreements of DWMC's insolvency.[6] During this initial phase of insolvency, DMA remained the exclusive distributor of Daewoo vehicles in the United States.

In December 2000, DWMC and the Receiver sent to DMA separate reminders to file a claim by January 15, 2001, a deadline established by the Korean Court. (Doc. 123, Ex. 8; Doc. 124, Ex. 9). In January 2001, DMA's then President Dong Jin Lee wrote DWMC to request assistance with claim filing. (Doc. 124, Ex. 10; *see also* Hong Depo.[7] Ex. 5 and at 54–55). With DWMC's aid, DMA retained the law firm Jin & Lee (Doc. 124, Ex 13), and DWMC appointed agents to act on DMA's behalf in the Korean proceedings. DMA did not object to DWMC's appointments (Hong Depo. at 48), and executed a Power of Attorney in favor of Jin & Lee. (Doc. 124, Ex. 10; *see also* Hong Depo. at 56).

On January 15, 2001, with the help of Jin & Lee, DMA filed a proof of claim before the Korean Court in the amount of $33 million, and in February 2001, filed a supplemental claim for $45,528,000.00. On February 26, 2001, DWMC's creditors held a meeting at which they reviewed the claims. Jin & Lee attended this meeting on behalf of DMA. The Receiver objected to most of DMA's claims, and the Korean Court therefore sent DMA a Notice of

---

**5.** A copy of the CRA was filed as Exhibit 33B to Document 126.

**6.** By letter from then DMA President Dong Jin Lee, DMA informed its employees on November 9, 2000, that DWMC was entering

into court receivership. (Doc. 123, Ex. 7). DMA touted the move as an "extremely positive step ...." (*Id.*).

**7.** The Hong Deposition was filed as Documents 133–135.

Objection.[8] The Korean Court also informed DMA that it was required to affirm the claims by filing claims against the objector by the end of March. Thus, in preservation of its rights, DMA filed a complaint in the Korean Court against the Receiver and DWMC challenging the objections and seeking approval of its claims. (Doc. 124, Ex. 15). DMA sent a second Power of Attorney to Jin & Lee with regard to the lawsuit. (Doc. 124, Ex. 19). The next month, however, DMA dropped the suit. (Doc. 124, Ex. 20).[9] DMA then filed a second supplemental claim for $1,090,968.00, which the Receiver approved.

At the same time that DWMC entered into receivership, it began acquisition talks with GM. Suzuki allegedly participated in these talks as an "Alliance Partner." (Doc. 153 at ¶ 28). On September 20, 2001, DWMC, DWMC's creditors, and GM entered into a non-binding Memorandum of Understanding ("MOU") regarding the sale of certain DWMC assets to GM. The MOU contemplated the formation of a new company that would own and operate select DWMC domestic and foreign assets and businesses. On September 26, 2001, the Korean Court approved the MOU.

On April 30, 2002, DWMC and certain creditors signed and negotiated in Korea a Master Transaction Agreement ("MTA") with GM.[10] Under the MTA, "Newco A"

(later known as GMDAT) would receive the exclusive right to distribute Daewoo vehicles and use the Daewoo trademark worldwide. Further, the MTA provided that assets would not be transferred until the Korean Court approved it and confirmed a reorganization plan that was consistent with its terms.

Days later, DWMC sought to terminate its Distribution Agreement with DMA, alleging material breach due to non-payment of $132 million.[11] On May 6, the Korean Court issued an order approving DWMC's Termination of the Distribution Agreement. (Doc. 143, Ex. 2). The Receiver also sent DMA a letter informing it of the material breach and giving DMA a 30–day cure period. (*See* Doc. 143, Ex. 3).[12]

Around the same time, on May 6, 2002, DWMC creditors held a meeting to approve the Reorganization Plan. By proxy executed by DMA, DWMC employee Han Su Pyon attended the meeting on DMA's behalf, voting in favor of this original Reorganization Plan. (Doc. 143, Ex. 9).

On May 16, 2002, DMA filed for bankruptcy in the Central District of California.[13] The California Bankruptcy Court granted a motion by the Official Committee of Unsecured Creditors of DMA for leave to be appointed to prosecute claims

---

8. The Receiver objected to all but about $1,344,291.00 of the claims.

9. Hong testified that DMA filed and withdrew its lawsuit against DWMC based on DWMC's instructions, but Hong also testified that DMA did not object to these instructions, and carried them out willingly. (Hong Depo. at 101–102).

10. The final Closing of the Transaction Pursuant to the Master Transaction Agreement occurred on October 17, 2002.

11. DMA disputes this breach, and claims that, pursuant to the Supply Agreement, DWMC

could not terminate the Distribution Agreement until PPM had been paid.

12. The letter asked DMA to pay the overdue amount, and stated, "Unless such payment is made within 30 days from the receipt hereof, the Distributorship Agreement shall be terminated." (Doc. 143, Ex. 3).

13. DWMC obtained approval from the Korean Court for DMA to file Chapter 11 Bankruptcy in the United States. (*See* Doc. 143, Ex. 1).

against DWMC. (Doc. 148, Ex. A).[14] In addition, pursuant to 11 U.S.C. § 362(a) and (c), a stay was automatically put in force to prevent any acts against DMA to take possession of or exercise control over DMA's assets.

On September 12, 2002, DWMC filed with the Korean Court a Modified Plan of Reorganization ("Modified Plan" or "Modified Reorganization Plan"), which incorporated the terms of the MTA. The Modified Plan differed from the original plan in that it provided for the sale of certain assets but not for the inclusion of DMA and its network of dealers. On September 30, 2002, DWMC creditors held another meeting to vote on the Modified Plan. Although DMA had notice of this meeting[15] and could have executed another proxy in favor Pyon to vote on DMA's behalf on the Modified Plan (Doc. 126, Ex. 31), no representative of DMA attended the meeting nor voted on the Modified Plan. The Korean Court approved the Modified Plan and the incorporated MTA on September 30. Thereafter, GMDAT was formed, and it acquired certain assets from DWMC. (*See* Doc. 123, Ex. 5C).[16]

GM elected to maintain the Daewoo brand name in places like Korea, where it did not have an established dealership network. In the United States, however, GM eliminated the Daewoo brand name but continues to sell the former Daewoo automobiles at U.S. GM dealerships under other brand names, including Suzuki and Chevrolet.

DMA alleges that Defendants' actions have caused the *de facto* termination of the Distribution Agreement, destroyed business opportunities, and caused DMA to fail to meet its contractual obligations with its U.S. dealers. In 2003, DMA sued Defendants in California Bankruptcy Court. Upon transfer by the Multidistrict Litigation Panel, the case now stands before this Court on the two motions to dismiss the First Amended Complaint.[17]

In the First Amended Complaint, DMA alleges against GM the following Counts: (I)[18] Fraud; (II) Tortious Interference with Contract; (III) Tortious Interference with Prospective Economic Advantage; (IV) Aiding and Abetting Breach of Fiduciary Duty; (X) Violation of the Automatic Stay, 11 U.S.C. § 362; (XII) Illegal Conduct Related to Motor Vehicle Business, Florida Statute § 320.64(4); and (XIII) Constructive Termination of Distribution Agreement, Mass. Stat. 93B § 4(c)(12). Against all Defendants, DMA alleges: (V) Violation of the Cartwright Act, Cal. Bus. & Prof.Code § 16720 *et seq.;* (VI) Unfair Competition, Cal. Bus. & Prof.Code § 17200; (VIII) Unauthorized Post–Petition Transfer, 11 U.S.C. § 549; (XI) Constructive Termination of

---

**14.** Andrew Bloomer filed a Supplemental Affidavit at Document 148.

**15.** On September 17, 2002, DWMC sent a letter to creditors informing them of the meeting on September 30, to discuss proposed changes to the Reorganization Plan. (Doc. 125, Ex. 32). In addition, DWMC sent to DMA a letter on September 19, 2002, informing DMA of the September 30 meeting. (Doc. 126, Ex. 31).

**16.** A copy of the Newco A Asset Transfer and Liability Assumption Agreement ("ATA") was filed as Exhibit 5C to Document 123.

**17.** Judge Sheri Bluebond of the California Bankruptcy Court dismissed several claims of the original complaint and allowed DMA to file an amended complaint. The First Amended Complaint was filed herein at Document 153.

**18.** The Roman numerals correspond with the Count numbers in the First Amended Complaint.

Distribution/Franchise Agreements, Florida Statute § 320.641; and (XIV) Constructive Termination of Distribution Agreement, Mass. Stat. 93B § 5. Finally, DMA alleges against GMDAT (VII) Successor Liability.

## II. Standard of Review and Analysis

### A. Validity of Korean Court's Orders

Defendants seek to dismiss all claims based on principles of comity. The comity doctrine applies only to "valid" orders of a foreign court. DMA challenges the validity of certain Korean Court orders, and hence this Court will begin its analysis here.

Specifically, DMA contends that the Korean Court's orders regarding the Modified Reorganization Plan and the MTA, which were issued after May 16, 2002 (the date on which DMA filed for bankruptcy), affected DMA's property rights under the Distribution Agreement[19] and are therefore void for taking action against the property of the debtor's estate in violation of the automatic stay under 11 U.S.C. § 362. *In re Schwartz,* 954 F.2d 569, 571 (9th Cir.1992) (actions taken in violation of automatic stay are void);[20] *Borg–Warner Acceptance Corp. v. Hall,* 685 F.2d 1306, 1308 (11th Cir.1982) (same). DMA further asserts that Defendants' actions of rebadging Daewoos and selling them in the United States under Chevrolet and Suzuki brand names constitute acts to obtain possession of, or exercise control over, property of the DMA estate.

■ Under § 362(a), upon commencement of a bankruptcy case in the United States, an injunction is automatically and immediately imposed, and said injunction stays all actions against a debtor and all acts that affect possession or control over property of the debtor's estate.[21] 11 U.S.C. § 362(a); *see In re Krystal Cadillac Oldsmobile GMC Truck, Inc.,* 142 F.3d 631, 637 (3d Cir.1998). While the Court agrees with DMA that the protections of § 362(a) apply extraterritorially, *see In re Simon,* 153 F.3d 991, 996 (9th Cir.1998),[22] *Underwood v. Hilliard (In re*

---

19. DMA asserts that, pursuant to the MTA and Modified Reorganization Plan, DWMC conveyed to GM the exclusive right to use the Daewoo brand and trademark, and that the MTA and Modified Plan empowered third parties to distribute former Daewoo products in the United States in violation of its exclusive rights under the Distribution Agreement.

20. Because this case has foreign relations implications and involves federal bankruptcy matters, federal law applies. To the extent it becomes relevant, the law of the Ninth Circuit controls, for the Multidistrict Litigation Panel transferred this case to this Court from California Bankruptcy Court for pre-trial matters.

21. The property of a bankruptcy estate includes the debtor's legal or equitable interests in property on the date of the commencement of the bankruptcy proceeding. 11 U.S.C. § 541(a)(1).

22. In *Simon,* the court assessed whether an injunction issued pursuant to 11 U.S.C.

§ 524(a)(2), which prohibits collection actions against the estate, had extraterritorial application. The *Simon* court stated:

> As applied to the concept of *in rem* bankruptcy jurisdiction, there is no functional difference between the automatic stay imposed by 11 U.S.C. § 362 upon the commencement of a bankruptcy and the injunction prohibiting collection actions against the bankruptcy estate provided in 11 U.S.C. § 524(a)(3). Each stay operates to protect the estate and the *in rem* jurisdiction of the bankruptcy court. Accordingly, we join the Seventh Circuit's logic [in *Underwood v. Hilliard (In re Rimsat, Ltd.),* 98 F.3d 956, 961 (7th Cir.1996)] and hold that a bankruptcy court may validly exercise its *in rem* jurisdiction to protect estate property wherever the property is located in issuing a discharge injunction under 11 U.S.C. § 524. Thus, the district court correctly held in this case that the 11 U.S.C. § 524 discharge enjoined [the plaintiff-appellant]

*Rimsat, Ltd.*), 98 F.3d 956, 961 (7th Cir. 1996), the salient question herein is not whether the stay extends to property located outside the United States, but rather whether the Korean Court's orders adversely affected any of DMA's property rights under the Distribution Agreement.[23] In this regard, Defendants contend that, pursuant to the Distribution Agreement, DMA had the right to distribute Daewoo products manufactured by DWMC, not GMDAT, and that therefore the rights under the Distribution Agreement differ from the rights transferred under the MTA and the Modified Reorganization Plan. As a result, argue Defendants, the Korean Court's orders approving the MTA and Modified Reorganization Plan did not take action against any property of DMA's estate.

■ The Court begins by looking to the plain terms of the Distribution Agreement. *Flores v. Am. Seafoods Co.*, 335 F.3d 904, 910 (9th Cir.2003) ("Under federal law, a written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations. Contract terms are to be given their ordinary meaning, and when the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself. Whenever possible, the plain language of the contract should be considered first.") (internal quotations and citations omitted); *Krystal Cadillac*, 142 F.3d at 635 (looking at contract as first step in assessing whether agreement was in effect and thus constituted property of the estate). The Distribution Agreement unambiguously contemplates DWMC as the Seller, and DMA as the Buyer with the exclusive right to distribute certain DWMC "Products."[24] Defendants argue that the Distribution Agreement also unambiguously contemplates that DMA would distribute only those cars manufactured by DWMC and therefore would not extend to cars manufactured by GMDAT.

■ Regardless of the definition of "Products," the contract contains no language to suggest that DMA has a broad right to sell or distribute any car manufactured by DWMC or its successors. Rather, the terms of the contract suggest only that DMA had the exclusive right to sell or distribute the "Products" of "Seller" (that is, DWMC) and that DMA had the exclusive right to distribute Daewoo vehicles (not Suzuki or Chevrolet vehicles) in the United States.[25] Based on the plain lan-

---

from commencing collection against any bankruptcy estate property regardless of its geographic location. *Id.* at 996.

**23.** Without ruling, the Court assumes for purposes of this Order that the Distribution Agreement was not terminated by DWMC's Notice of Termination filed in the Korean Court and the subsequent running of the 30-day cure period. The Court questions, however, why DWMC would have attempted to terminate the Distribution Agreement if it had no relevance to its corporate reorganization, but that inquiry is not important herein.

**24.** Although the term "Products" apparently was intended to encompass vehicles and parts manufactured by DWMC, it is not otherwise

defined, and as explained *supra*, Exhibit A was never attached. Whatever this term includes, the contract expressly reserves in DWMC the right to change or delete the "Products" at any time. (*See* Doc. 144, Ex. 7).

**25.** Further, the Court takes judicial notice of the complaint filed as an adversary proceeding by DMA in Chapter 11 Case No. 02–24411BB pending before U.S. Bankruptcy Judge Sheri Bluebond. (Doc. 158, Ex. 1). Paragraph 14 of that complaint reads as follows:

Beginning on or about January 1, 1998, the Debtor and DWMC entered into various agreements whereby DWMC granted the Debtor the exclusive right to purchase Dae-

guage of the Distribution Agreement, the Court finds that DMA does not have property rights to distribute the vehicles currently manufactured by GMDAT[26] and sold in the United States under the Suzuki and Chevrolet brand names.[27] To construe the Distribution Agreement in the manner DMA suggests, the Court would have to find that the Agreement gave DMA the exclusive right in perpetuity to distribute in the United States any and all vehicles made by DWMC or its successors. Nothing in the contract suggests such a reading, and indeed such a reading strains credulity.

woo vehicles and products *manufactured by DWMC* for distribution within the United States . . . .
*Id.* (emphasis added). The Court also takes notice of a letter sent to GM Counsel Andrew Bloomer by DMA Bankruptcy Attorney Theodore Stolman, in which Stolman wrote, "DMA holds the exclusive rights to distribute *Daewoo* automobiles and parts within the United States and its territories." (Doc. 126, Ex. 34).

26. Issues of successor liability are discussed below.

27. Judge Stephen Robinson addressed similar arguments in *Subaru Distributors Corp. v. Subaru of America, Inc. et al.*, Case No. 03–Civ–9608 (SCR) (S.D.N.Y. June 23, 2004). Judge Robinson rejected the contention of Subaru Distribution Corp. ("SBC")—the equivalent of DMA herein—that the distribution agreement and amending memorandum of understanding gave SBC the right to distribute Subarus rebadged as Saabs. In that case, however, the products at issue were expressly defined in the contract whereas in the instant case, the Agreement is effectively silent on the definition of "Products." *See also Volvo Trademark Holding Aktiebolaget v. CLM Equip. Co.*, 236 F.Supp.2d 536, 553 (W.D.N.C.2002) (finding, with regard to a breach of contract claim, that the plain language definition of "products" in the dealership agreement clearly referred to accessories manufactured by Champion Road under its own mark, not to any product manufactured by Champion regardless of trademark thereon).

As set forth in the MTA and as approved in the Modified Reorganization Plan, GM/GMDAT acquired certain manufacturing assets and rights of DWMC's.[28] The property rights under the MTA are wholly different from DMA's contract rights under the Distribution Agreement.[29] Because DMA does not, by virtue of the Distribution Agreement,[30] possess the exclusive right to sell GMDAT-manufactured cars, the Korean Court's orders approving the MTA and Modified Reorganization Plan did not affect any property of DMA's estate and did not violate the automatic stay.[31]

28. For a detailed list of DWMC assets acquired by GMDAT, *see* the ATA. (Doc. 123, Ex. 5C).

29. As noted previously, the Distribution Agreement was not assigned to GMDAT. Rather, DWMC sought to terminate it.

30. To the extent DMA argues that it also possesses exclusive rights under the Trademark Agreement when read in conjunction with the Distribution Agreement and Supply Agreement, the Court finds that the argument fails. The Trademark Agreement expressly states it is a non-exclusive license, and this Court will not alter the unambiguous terms of that contract.

31. This ruling comports with Judge Bluebond's "Tentative Ruling" of July 30, 2003. In that ruling, she stated:

The Distribution Agreement did not give the debtor a right to distribute in the United States any vehicles ever manufactured at any plant then owned by the Korean parent, regardless of who owns the facility or who does the manufacturing. The Korean parent had the right to stop producing Daewoo vehicles without breaching the contract. The Korean parent also had the right to sell some or all of its assets to a third party who wasn't bound by the distribution agreement. (Moreover, it is not clear that the proposed conduct would violate the distribution agreement even if GMDAT were bound by it.).
(Doc. 126, Ex. 36).

Having found that the Korean Court's orders did not violate the automatic stay, the Court now turns to the broader question of comity.

## C. Comity

■ *Hilton v. Guyot,* 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895), set forth the general principle of comity as this:

> where there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect, the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or an appeal, upon the mere assertion of the party that the judgment was erroneous in law or in fact.

*Id.* at 158, 16 S.Ct. 139. Comity is discretionary; it is not a rule of law, but a rule of practice, convenience, and expediency. *Id.* at 163–64, 16 S.Ct. 139 ("Comity, in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to the international duty and convenience, and to the

rights of its own citizens, or of other persons who are under the protection of its laws."); *Ungaro–Benages v. Dresdner Bank AG,* 379 F.3d 1227, 1237–38 (11th Cir.2004); *Remington Rand Corp.–Del. v. Bus. Sys. Inc.,* 830 F.2d 1260, 1267 (3d Cir.1987); *Somportex Ltd. v. Philadelphia Chewing Gum Corp.,* 453 F.2d 435, 440 (3d Cir.1971). Generally, a court should evaluate: "(1) whether the foreign court was competent and used 'proceedings consistent with civilized jurisprudence,' (2) whether the judgment was rendered by fraud, and (3) whether the foreign judgment was prejudicial because it violated American public policy notions of what is decent and just." *Ungaro–Benages,* 379 F.3d 1227, 1238–39 (internal citations omitted).

■ Analyzing whether comity applies to a foreign judgment [32] bears similarity to analyzing whether *res judicata* applies to a domestic judgment. *International Trans., Ltd. v. Embotelladora Agral Regiomontana,* 347 F.3d 589, 593 (5th Cir.2003). "Essentially, once the parties have had an opportunity to present their cases fully and fairly before a court of competent jurisdiction, the results of the litigation process should be final." *Id.* (citations omitted).

■ In the bankruptcy context, the doctrine is especially applicable, for comity enables a debtor's assets to be dispersed equitably and systematically rather than haphazardly or erratically. *Id.* at 593–94; *Overseas Inns S.A. P.A. v. United States,* 911 F.2d 1146, 1149 (5th Cir.1990). In this case, GM claims that: 1) the Korean proceedings occurred before a court of competent jurisdiction; 2) DMA had actual notice of and participated in those pro-

---

**32.** To grant comity, a judicial act need not be a final judgment. *Remington,* 830 F.2d at 1266.

ceedings; 3) DMA consented to the reorganization plan and asset transfer; 4) the Korean Court procedures are consistent with U.S. bankruptcy law principles; 5) recognition of the Korean proceedings and orders promotes the orderly distribution of assets and resolution of claims related to the insolvent company; and 6) DMA's claims amount to an improper collateral attack on the MTA and Modified Reorganization Plan. The Court will address these arguments below.

### 1. Due Process Concerns

#### a. Similarity of Korean and U.S. Bankruptcy Laws

■ In looking to the laws of Korea to ensure they comport with U.S. notions of fairness and due process, such as notice and an opportunity to be heard, the Korean laws need not be identical to the laws of the United States. *International Trans.,* 347 F.3d at 594 (internal citations omitted); *In re International Admin. Servs.,* 211 B.R. 88, 96 (Bankr.M.D.Fla.1997) (finding similar though not identical laws of Guernsey provided sufficient procedural safeguards to protect the party's interests). The Court finds that the bankruptcy laws of Korea are substantially similar to the laws of the United States and comport with general notions of due process. *See, e.g. Allstate Life Ins. Co. v. Linter Group Ltd.,* 994 F.2d 996, 999–1000 (2d Cir.1993) (rejecting plaintiff's argument that, because Australian bankruptcy law did not provide for an automatic stay,[33] the court should not grant comity, and holding that such minor procedural differences were insufficient to demonstrate prejudice for having to maintain an action in Australia); *In re Kyu–Byung Hwang,* 309 B.R. 842, 846 (Bankr.S.D.N.Y.2004) (holding that Korean Bankruptcy law, and in particular the CRA, was "substantially similar" to U.S. law and did not discriminate against non-Korean creditors or offend U.S. notions of due process).[34] On this subject, there is no serious debate.

#### b. Control by DWMC

Whether DMA actually enjoyed due process is, however, hotly contested. Defendants contend that DMA enjoyed full participation in and had full notice and opportunity to be heard in the Korean Court insolvency proceedings. DMA alleges that, from the start of the insolvency process until the date it filed for bankruptcy in the United States, it was controlled by DWMC[35] and therefore did not fully and independently participate. The Court rejects DMA's argument, for the record reveals that, despite being a wholly owned subsidiary, DMA had the ability to control its actions throughout DWMC's reorganization, and in fact did exercise significant control. For example, DMA asked DWMC for help in hiring counsel, and DMA in fact retained the law firm of Jin & Lee. DMA executed Powers of Attorney in favor of Jin & Lee, and participated in the preparation of its claims submitted to

---

**33.** Korean law also does not provide for an automatic stay.

**34.** It is noteworthy, however, that the *Kyu–Byung Hwang* court did not consider reciprocity, as this Court does below. This is likely so because the Second Circuit rejects reciprocity as a factor in the comity analysis. The *Kyu–Byung Hwang* case is helpful to the extent it recognizes Korean insolvency law as generally comporting with U.S. notions of fairness and due process.

**35.** DMA alleges in its First Amended Complaint that it was controlled by DWMC until October 16, 2003, (*see, e.g.,* Doc. 153 at ¶ 7), but in its papers and depositions filed with the Court, DMA suggests that DWMC ceased control over DMA on May 16, 2002, the date on which DMA declared bankruptcy. (*See, e.g.,* Doc. 138 at 8).

the Korean Court [36] as well as the filing and withdrawal of the lawsuit against DWMC.

As is evident, DMA actively sought and obtained independent representation and took steps to preserve its rights throughout the reorganization. DMA cannot now claim that its status as a wholly owned subsidiary rendered it an unrepresented puppet in DWMC's insolvency process. [37] *Cf. International Trans.*, 347 F.3d at 595 (holding that the plaintiff would be bound by notices sent to its agent and that its obligation to act in preservation of its own rights did not cease upon the filing of a claim by its agent).

### c. Notice and Participation

DMA also contends it did not receive full notice and did not vote on the Modified Reorganization Plan and therefore did not enjoy full participation. The Court again

rejects DMA's argument. The record demonstrates that DMA had notice of all key events from the start of the insolvency until its closing, as well as the opportunity to be heard on all matters, including the Modified Plan. Indeed, DMA knew about the September 30 creditors' meeting at which the Modified Reorganization Plan was to be put to a vote, but voluntarily chose not to attend by proxy [38] or otherwise. [39] Because DMA had notice of the Modified Plan, failed to vote on it, and chose not to object to it, DMA effectively consented to the Modified Plan. *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285 (7th Cir.2002) (suggesting that, where a party has notice, failure to object "counts" as consent).

### 2. Reciprocity

 In determining whether to grant comity, one permissible factor, though not

---

**36.** Hong testified that he prepared the first claim for DMA and submitted it to DWMC. He also testified that Jin & Lee prepared the supplemental claims with information provided by Hong. (*See* Hong Depo. at 42, 45). In addition, then DMA President Lee sent to DWMC the second supplemental claim with the understanding that it would be filed with the Korean Court. (*Id.* at 52).

**37.** Corporate conglomerates often have interlocking directors. Plaintiff's argument would have this Court assume that the DMA Board of Directors and its management violated their fiduciary duties to DMA. This Court is not willing to make this assumption.

**38.** In-house DMA counsel Agnes Cha wrote to DMA Bankruptcy Attorney Stolman on September 3, 2002, stating in relevant part: "Attached is proposed Proxy for voting and acceptance to consent confirmation of proposed modification to DWMC's reorganization plan and cover memo from Korea requesting us to execute the Proxy." (Doc. 126, Ex. 34).

**39.** In his Declaration (Doc. 126, Ex. 34), Stolman stated:
 On or about September 23, 2002, Lee & Ko . . . a law firm in South Korea that has been retained by the Debtor [DMA] with respect

to the insolvency proceeding of [DWMC], advised me that, in light of an upcoming meeting of [DWMC's] creditors to approve [the] revised plan of reorganization, the Debtor should file its claim in [the Korean] insolvency proceeding immediately.
(Doc. 126, Ex. 34). This representation indicates that DMA had notice of the Modified Plan and the September 30 meeting. Indeed, the California Bankruptcy Court appointed the Creditors Committee to act on behalf of DMA, and DMA is bound by any decisions that the Committee made. If the Committee elected not to file a claim, DMA cannot now collaterally attack that decision by suing GM and the other Defendants.
 In addition, DMA President Hong testified that DMA did not instruct anyone to attend the September 30 creditors' meeting on its behalf. Further, DMA did not oppose or approve the Modified Plan, and Hong did not tell its appointee to do one thing or the other with regard to the Modified Plan. (*See* Hong Depo. at 126 and 129). Apparently, DMA relied on the assumption that the automatic stay imposed by the filing of its own bankruptcy would trump all further proceedings in the Korean Court.

an absolute prerequisite, is whether the foreign court recognizes U.S. judgments. *Remington,* 830 F.2d at 1273 ("Although reciprocity is no longer an absolute condition precedent to comity, it is always a permissible consideration, and here we believe it to be a consideration of extreme importance."); *Her Majesty Queen in Right of Province of Brit. Columbia v. Gilbertson,* 597 F.2d 1161, 1163–64 (9th Cir.1979)[40] ("Before comity may be extended, generally there is a requirement of reciprocity, which is the principle that the courts of one jurisdiction will recognize a judgment from a second jurisdiction only if the courts of the second jurisdiction would recognize a judgment from the first jurisdiction's courts."); *International Trans.,* 347 F.3d at 597 (Smith, J., dissenting) ("The test [under the *Hilton* case for comity] encourages respect for foreign courts (in hope of reciprocal respect), discourages protracted re-litigation of the same dispute, and ensures procedural fairness for the aggrieved party."); *Corporacion Salvadorena de Calzado v. Injection Footwear Corp.,* 533 F.Supp. 290, 299 (S.D.Fla. 1982) (accepting and adopting Special Master's recommendation that judgment rendered in El Salvador should be denied comity based on the reciprocity rule—"if the rendering state ... would refuse to recognize a judgment of the State of Flori-

da because of a particular defect, then Florida would refuse to recognize a like judgment rendered by [that state].") (internal citations omitted).

In *Remington,* as here, the court found compelling the fact that Dutch law did not recognize as binding orders of foreign courts. 830 F.2d at 1268. Similarly, the CRA of Korea adopts a territorial approach and does not defer to U.S. bankruptcy law.[41] This lack of reciprocity gives this Court pause. However, reciprocity is but one factor to weigh, *Remington,* 830 F.2d at 1273, and when weighed against the other factors, it does not win the day.[42]

### 3. Comity is Appropriate

After taking into account all the foregoing considerations, the Court concludes that granting comity is proper. Korea has significant interest in regulating business activity on its shores, *Overseas Inns,* 911 F.2d at 1149 (noting that U.S. courts consistently recognize foreign courts' interest in winding up the affairs of their domestic business entities), and any differences between Korean and U.S. bankruptcy law are minimal and do not offend U.S. notions of due process.[43] Moreover, DMA had notice, as well as a full and fair opportunity to participate in all facets of the Korean bankruptcy process. *Allstate,* 994 F.2d at

40. The Ninth Circuit recognized that the reciprocity requirement "has fallen into some disfavor." *Her Majesty,* 597 F.2d at 1164 n. 6.

41. CRA Article 4.2 provides: "Reorganization proceedings commenced in a foreign country shall not have any effect on property in the territory of the Republic of Korea." (Doc. 126, Ex. 33B).

42. In this case, unlike *Remington,* a friendship treaty exists between Korea and the United States. *See Choi v. Kim,* 50 F.3d 244 (3d Cir.1995) (acknowledging Treaty of Friendship, Commerce and Navigation Between the United States of America and The Republic of Korea, 8 U.S.T. 2217, which "elevates a Korean judgment to the status of a sister state judgment."). While the existence of a Friendship Treaty is not dispositive, *id.* at 250 (holding, ultimately, that the Korean procedures executed pursuant to the Code of Civil Procedure did not comport with U.S. notions of due process) it certainly is a relevant consideration.

43. DWMC was a substantial corporate citizen of Korea, employing thousands of people and involving numerous creditors.

1000 (granting comity to Australian court because plaintiff had full notice, attended all meetings and hearings, were represented on relevant committees, and filed two actions in the Australian courts). If DMA objected[44] to the relevant transactions[45] and orders, it should have done so before the Korean tribunal.[46] *International Trans.*, 347 F.3d at 594 (creditors of an insolvent foreign corporation may be required to assert their claims before a duly convened foreign bankruptcy tribunal to preserve claims against a foreign bankrupt); *In re Int'l Nutronics, Inc.*, 28 F.3d 965, 969 (9th Cir.1994) (in *res judicata* context, a party is barred from seeking relief on grounds that *could have been asserted* in a prior suit between the same parties on the same cause of action). The fact that DMA now seeks to hold GMDAT liable as the successor of DWMC` highlights DMA's true intention—to collaterally attack the entire Korean reorganization process and result. This Court will not permit such an improper collateral attack to undo the Korean Court's efforts regarding the MTA and Modified Reorganization Plan. Instead, the Court will grant comity to the Korean Court proceedings and orders and thereby help to preserve an orderly and systematic distribution of assets.

**44.** There is evidence that DMA harbored grave concerns about a "potential breach" of the Distribution Agreement and knew of GM's potential decision to exclude DMA's U.S. operations from the GM–DWMC agreements. In fact, DMA management wrote to GM to express its concerns on March 27, 2002. (*See* Doc. 124, Ex. 21).

**45.** It is worth noting that DMA ultimately stands to benefit from these transactions.

**46.** Again, this Court's ruling mirrors Judge Bluebond's "Tentative Ruling:"

## IV. Conclusion

For all the foregoing reasons, Defendants' Motions to Dismiss (Docs. 73 and 136) are **GRANTED**.

If the debtor believed that the sale of a portion of the Korean parent's manufacturing facilities to GMDAT would result in a breach of an enforceable contract with the debtor, the debtor could and should have raised that issue at the time of sale in Korea... whether the debtor objected to the sale and had its objection overruled or whether the debtor could have objected to the sale and choose not to do so, the result should be the same. It is too late for the debtor to argue that the sale or transfer of these facilities violated its contract rights. (Doc. 126, Ex. 36).