[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUG 11, 2006
THOMAS K. KAHN
CLERK

_____

No. 04-15878

_____

D. C. Docket No. 04-00201-CV-ORL-31-KRS

DAEWOO MOTOR AMERICA, INC.,

Plaintiff-Appellant,

versus

GENERAL MOTORS CORP.,
SUZUKI MOTOR CORPORATION,
AMERICAN SUZUKI MOTOR CORPORATION,

Defendants-Appellees,

GM DAEWOO AUTO & TECHNOLOGY CO.,

Defendant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(August 11, 2006)**

Before TJOFLAT, PRYOR and ALARCÓN,[*] Circuit Judges.

PRYOR, Circuit Judge:

The main issue presented in this appeal is whether the district court abused its discretion when it dismissed several claims of Daewoo Motor America, Inc. against General Motors Corporation, Suzuki Motor Corporation, American Suzuki Motor Corporation, and GM Daewoo Auto & Technology Co. (GMDAT) on the ground of international comity. Daewoo America complained that its legal rights, as the exclusive distributor of Daewoo vehicles in the United States, were violated after a Korean bankruptcy court approved a sale of the assets and liabilities of the Korean parent company of Daewoo America and the defendants then sold in the United States automobiles manufactured by GMDAT. Daewoo America was a claimant represented by counsel in the Korean bankruptcy proceedings but, after notice, did not object to the sale of the assets and liabilities of its Korean parent. We affirm.

## I. BACKGROUND

Daewoo America was incorporated in 1997 as a wholly owned subsidiary of Daewoo Motor Co., Ltd. (Daewoo Korea), a South Korean automobile manufacturer. Daewoo America served as the exclusive distributor of Daewoo

---

[*] Honorable Arthur L. Alarcón, United States Circuit Judge for the United States Court of Appeals for the Ninth Circuit, sitting by designation.

automobiles in the United States and the exclusive provider of warranty services and replacement parts. On November 18, 1999, Daewoo Korea and Daewoo America entered into an Automobile Purchase and Distribution Agreement. Under the Agreement, Daewoo Korea agreed to sell to Daewoo America certain "Products" and granted to Daewoo America "the exclusive right to distribute, sell, rent, lease and otherwise dispose of . . . and service . . . the Products in the United States . . . ." The Agreement also provided that "'Products' shall mean the motor vehicles provided on Exhibit A attached hereto (as said Exhibit A may be amended from time to time by Seller to add or delete motor vehicle models)." The parties agree that "Exhibit A" never existed and was not attached to the Agreement.

On November 10, 2000, after experiencing financial difficulties, Daewoo Korea filed for bankruptcy protection in Korea under the Korean Corporate Reorganization Act, and the Korean court appointed a receiver. By letter dated November 8, 2000, Daewoo Korea notified Daewoo America of its reorganization plans. The letter included a summary of Korean reorganization law. The letter also warned that creditors must participate in the reorganization and that failure to file a claim would result in a loss of rights.

On November 14, 2002, the Korean bankruptcy court ordered the preservation of the assets of Daewoo Korea. On November 30, 2000, the court

ordered the commencement of the reorganization procedure and set the deadline of January 15, 2001, for filing claims. On December 5, 2000, the receiver for Daewoo Korea sent Daewoo America a notice of the filing deadline and guidelines on how to file a claim. In response, Dong Jin Lee, President of Daewoo America, communicated with representatives of Daewoo Korea to obtain assistance with filing a claim in the reorganization proceeding and with employment of an attorney. With the aid of Daewoo Korea, Daewoo America retained the law firm Jin & Lee and executed a Power of Attorney in favor of the firm. Daewoo Korea also appointed agents to act on behalf of Daewoo America in the Korean proceedings. Daewoo America did not object to the appointments.

With the aid of Jin & Lee, Daewoo America filed a proof of claim before the Korean court for approximately $33 million, and on February 3, 2001, filed a supplemental claim for over $45.5 million. On February 26, 2001, the creditors of Daewoo Korea held a meeting at which they reviewed the claims. Jin & Lee attended the meeting on behalf of Daewoo America. The Receiver objected to most of the claims of Daewoo America, which was notified of the objections by the Korean court. The Korean court also notified Daewoo America that it was required to affirm its claims by filing a claim against the Receiver by the end of March.

4

Daewoo America then filed a complaint in the Korean court against the Receiver and Daewoo Korea. Daewoo America challenged the objections of the Receiver and sought approval of it claims. The following month, Daewoo America dismissed its complaint. In 2002, Daewoo America filed a second supplemental claim for approximately $1.1 million, which the Receiver approved in its entirety.

Both before and during its reorganization proceedings, Daewoo Korea negotiated with Ford Motor Company and GM about the possibility of a transfer of ownership. In September 2000, Ford withdrew its bid, but negotiations with GM continued. On September 20, 2001, Daewoo Korea and GM executed a non-binding Memorandum of Understanding regarding the sale of assets of Daewoo Korea to GM. The Korean court approved the Memorandum of Understanding on September 26, 2001.

Daewoo America contends that it was to be included in the assets to be purchased by GM, and GM affirmatively represented that Daewoo America would continue to distribute automobiles in the United States under the acquisition plan intended by GM. At an automobile convention in January 2002, GM executives allegedly represented that they looked forward to a working relationship between Daewoo America and GM. Daewoo America alleges that it continued to expand its business based on these representations by GM.

On March 27, 2002, the management team of Daewoo America wrote to GM regarding the possible exclusion of Daewoo America from the asset acquisition. The management team expressed its "extreme concerns about the far reaching negative implications of the possible exclusion of . . . U.S. operations from the agreements associated with General Motors' pending acquisition of certain assets of Daewoo Korea." The letter also expressed concern about the "potential breach arising from the Automobile Purchase and Distribution Agreement between Daewoo Korea and Daewoo America."

By a letter dated April 17, 2002, Daewoo Korea notified Daewoo America of a meeting to examine the proposed reorganization plan to be held on May 6, 2002. Daewoo America also received a letter of proxy and a summary of the proposed reorganization plan. The summary of the proposed reorganization did not refer to the Memorandum of Understanding or the proposed asset transfer. Despite the concerns expressed in the March 27, 2002, letter, Daewoo America executed the proxy and thereby accepted "the Proposed Reorganization Plan filed by the receiver" and granted to "Han Su Pyon, . . . an officer of [Daewoo Korea], the full power and authority to exercise its voting rights in the meeting of parties in interest as though exercised by the undersigned."

On April 30, 2002, GM, Daewoo Korea, and creditors of Daewoo Korea

entered into a Master Transaction Agreement (MTA). The MTA contemplated the creation of a new company, GMDAT, to acquire assets and assume liabilities of Daewoo Korea. Among the assets to be acquired were the vehicle manufacturing plants at which the Daewoo automobiles to be exported for sale in the United States were manufactured. Daewoo America was not included in the assets to be transferred. At the May 6, 2002, meeting of the creditors, the creditors voted in favor of the original reorganization plan. The Korean court approved the plan, but requested that the receiver file a modified reorganization plan that reflected the terms of the MTA entered on April 30, 2002.

At the same time, the Receiver for Daewoo Korea sought permission from the Korean court to terminate the distribution agreement with Daewoo America for non-payment of approximately $130 million. The Korean court approved the petition of Daewoo Korea on May 6, 2002. The Receiver sent a letter to Daewoo America requesting payment of the outstanding debt, barring which the Distribution Agreement would be terminated.

On April 21, 2002, Daewoo Korea requested permission from the Korean court for Daewoo America to file for bankruptcy in the United States. The Korean court approved the petition, and on May 16, 2002, Daewoo America filed for protection under Chapter 11 in the United States Bankruptcy Court for the Central

7

District of California.  In proceedings before the California bankruptcy court, Daewoo America stated that it "fully intend[ed] to pursue all possible causes of action against Daewoo Korea, GM and others, if appropriate."  In a letter to counsel for GM dated June 7, 2002, counsel for Daewoo America advised that "[Daewoo America] deems any action by GM to distribute automobiles in the United States manufactured at facilities of Daewoo Motor Co., Ltd. to be a violation and infringement of [Daewoo America's] exclusive right to distribute [Daewoo America] automobile products in the United States."

On September 12, 2002, Daewoo Korea filed a modified reorganization plan that included the terms of the MTA.  Daewoo Korea then sent a letter to its creditors to inform them that a meeting on the modified reorganization plan was scheduled for September 30, 2002.  Daewoo America received another proxy form to vote on the modified plan.  In response to the filing of the modified reorganization plan, Korean counsel for Daewoo America advised that Daewoo America should file its claim in the Korean bankruptcy proceeding promptly.  Counsel for Daewoo America in turn notified its creditors' committee, which was authorized by the California bankruptcy court to pursue claims against Daewoo Korea on behalf of Daewoo America, of the need to "promptly take the necessary action to protect the estate's interest."

8

On September 30, 2002, the creditors of Daewoo Korea adopted and the Korean court approved the modified reorganization plan, which included the MTA. Despite its notice of the meeting and warnings from counsel, Daewoo America did not attend the September 30 meeting and did not execute a proxy to vote for or against the modified reorganization plan. Daewoo America also did not assert any further claims against Daewoo Korea in the Korean court.

On October 17, 2002, GM, Daewoo Korea, and the creditors of Daewoo Korea closed the transactions under the MTA in which assets of Daewoo Korea were transferred to GMDAT. In February 2003, GM and its affiliate American Suzuki announced that they would begin selling automobiles manufactured by GMDAT in the United States under the Chevrolet and Suzuki brands. GMDAT would continue to use the Daewoo brand name in South Korea and all other countries in which GMDAT had acquired subsidiaries. In July 2003, GMDAT announced that its first shipment of vehicles had been made to North America.

On July 22, 2003, Daewoo America filed an action against GM, GMDAT, Suzuki, and American Suzuki in the California bankruptcy court and alleged fraud, tortious interference with contract, tortious interference with prospective economic advantage, aiding and abetting breach of fiduciary duty, violation of the Cartwright Act, unfair competition, unjust enrichment, successor liability, fraudulent transfer,

and violation of the automatic stay. Daewoo America sought damages and injunctive relief. The following day, Daewoo America moved the California bankruptcy court to issue a temporary injunction to prevent GM and American Suzuki from importing or selling in the United States any vehicles manufactured by GMDAT. The court denied the motion.

In August 2003, GM and American Suzuki moved to dismiss many of the claims brought by Daewoo America. In October 2003, the motions were denied in part and granted in part. The California bankruptcy court dismissed several claims against GM and American Suzuki with leave to amend, but dismissed the claims for unjust enrichment and fraudulent transfer without leave to amend.

Daewoo America filed its amended complaint on November 20, 2003. The amended complaint included claims for fraud, tortious interference with contract, tortious interference with prospective economic advantage, aiding and abetting breach of fiduciary duty, violation of the Cartwright Act, unfair competition, successor liability, unauthorized post-petition transfer, violation of the automatic stay, and several claims under Florida and Massachusetts statutes. The defendants moved to dismiss the amended complaint on multiple grounds.

The California bankruptcy court dismissed the claims for violation of the Cartwright Act, unfair competition, and violations of the Massachusetts statutes

10

without leave to amend; dismissed the claims under the Florida statutes with leave to amend; scheduled a hearing on the motions concerning the claims of successor liability, unauthorized post-petition transfer, and violation of the automatic stay; and denied the motions as to the claims of fraud, tortious interference with contract, tortious interference with prospective economic advantage, and aiding and abetting breach of fiduciary duty.  In February 2004, the Judicial Panel on Multidistrict Litigation transferred the action to the United States District Court for the Middle District of Florida "'for inclusion in the coordinated or consolidated pretrial proceedings occurring' for In re Daewoo Motor Co., Ltd., Dealership Litigation, MDL Docket No. 1510."

The transferee district court instructed the parties to submit supplemental briefs on the question of international comity and held a hearing on August 20, 2004.  On August 26, 2004, the district court dismissed the amended complaint with prejudice on the ground of international comity.  Daewoo Motor Am., Inc. v. Gen. Motors Corp., 315 B.R. 148, 161 (2004).  The district court also ruled that the Modified Reorganization Plan and MTA approved by the Korean court did not violate the automatic stay of the bankruptcy of Daewoo America because the Distribution Agreement did not give Daewoo America property rights in vehicles manufactured by GMDAT.  Id. at 160.

11

The district court explained that granting comity to the Korean bankruptcy proceeding was proper for three reasons. First, the district court found that "Korea has significant interest in regulating business activity on its shores." Id. Second, the district court found that "any differences between Korean and U.S. bankruptcy law are minimal and do not offend U.S. notions of due process." Id. Third, the district court found that Daewoo America "had notice, as well as a full and fair opportunity to participate in all facets of the Korean bankruptcy process." Id. The district court concluded that the "fact that [Daewoo America] now seeks to hold GMDAT liable as the successor of [Daewoo Korea] highlights [Daewoo America's] true intention—to collaterally attack the entire Korean reorganization process and result." Id. at 161.

Daewoo America moved the district court for clarification and reconsideration of its order. The district court denied the motion to reconsider, and to the extent clarification was sought, clarified that the order dismissed all of the claims of Daewoo America against the defendants on the ground of comity. The district court entered final judgment for the defendants. Daewoo America appealed.

## II. STANDARD OF REVIEW

The parties dispute the applicable standard of review. Daewoo America

12

argues, on the one hand, that we should apply the de novo standard of review applicable to the review of an order granting a motion to dismiss. The defendants argue, on the other hand, that we should review the decision of the district court only for abuse of discretion.

We agree with the defendants. The principle of international comity applied in this case is an abstention doctrine. Ungaro-Benages v. Dresdner Bank AG, 379 F.3d 1227, 1238 (11th Cir. 2004). "While we ordinarily review the grant of motions to dismiss or summary judgment de novo, see Parks v. City of Warner Robins, Georgia, 43 F.3d 609, 612-13 (11th Cir.1995), 'a district court's decision to abstain will only be reversed upon a showing of abuse of discretion.'" Boyes v. Shell Oil Prods. Co., 199 F.3d 1260, 1265 (11th Cir. 2000) (quoting Rindley v. Gallagher, 929 F.2d 1552, 1554 (11th Cir. 1991)).

We review the factual determinations of the district court for clear error and questions of law de novo. Coloma v. Holder, 445 F.3d 1282, 1284 (11th Cir. 2006). "An error of law constitutes an abuse of discretion." Wexler v. Lepore, 385 F.3d 1336, 1338 (11th Cir. 2004). The interpretation of a contract is a question of law that the court reviews de novo. Tobin v. Mich. Mut. Ins. Co., 398 F.3d 1267, 1274 (11th Cir. 2005).

## III. DISCUSSION

Daewoo America makes four arguments on appeal. First, Daewoo America argues that the district court erroneously concluded that the order of the Korean court that approved the reorganization of Daewoo Korea did not violate the automatic stay of the bankruptcy of Daewoo America. Second, Daewoo America argues that the order of the Korean court was not entitled to comity. Third, Daewoo America argues that, even if comity was appropriate, the order of the Korean court had no effect on the claims that Daewoo America raised against the defendants. Fourth, Daewoo America argues that the California bankruptcy court erred when it dismissed the claim for unjust enrichment with prejudice. We address each argument in turn.

### A. *The Approval of the Modified Reorganization Plan of Daewoo America by the Korean Court Did Not Violate the Automatic Stay.*

The Bankruptcy Code provides that a petition for bankruptcy "operates as a stay . . . of . . . any act to obtain possession of property of the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). "Property of the estate" is defined as "all legal or equitable interest of the debtor in property as of the commencement of the case." Id. § 541(a)(1). The property of the estate of Daewoo America includes any contractual rights that it owned when it filed for bankruptcy.

14

Daewoo America contends that the Modified Reorganization Plan impaired its property rights in the exclusive distribution agreement with Daewoo Korea. Daewoo America contends that the district court erroneously interpreted the Distribution Agreement to conclude that the rights of Daewoo America under the Distribution Agreement were not impaired by the approval of the Modified Reorganization Plan and that the order of the Korean court did not violate the automatic stay. Daewoo America makes two arguments in support of this contention.

First, Daewoo America argues that the district court erroneously relied on federal, rather than California, law when it interpreted the Distribution Agreement. Daewoo America argues that, under California law, "even if the written agreement of the parties is clear and unambiguous on its face, the trial judge must consider relevant extrinsic evidence that can prove a meaning to which the language of the contract is reasonably susceptible." Because the district court interpreted the contract under federal law and only looked at the "plain language" of the Distribution Agreement to interpret the contract, Daewoo America argues the interpretation of the district court was erroneous. The problem for Daewoo America is that it waived this argument.

Daewoo America failed to raise the choice of law in its arguments and

15

motions before the district court, and Daewoo America failed to raise any question regarding the use of federal law in its motion for reconsideration of the order of the district court. See William Penn Life Ins. Co. of N.Y. v. Sands, 912 F.2d 1359, 1362 n.2 (11th Cir. 1990). On the contrary, in its motion, Daewoo America stated that it "[did] not seek reconsideration of the Court's ruling that the Distribution Agreement does not cover vehicles manufactured by or on behalf of GMDAT." After having failed to raise the choice of law before the district court and, in fact, having disavowed any intention to seek reconsideration, Daewoo America cannot now argue that the law used in the interpretation of the contract by the district court was erroneous. See id.

Second, Daewoo America argues that the interpretation of the Distribution Agreement by the district court is not supported by the language of the contract. Daewoo America argues that the district court erroneously concluded that the Distribution Agreement "unambiguously contemplates that [Daewoo America] would distribute only those cars manufactured by [Daewoo Korea] and therefore would not extend to cars manufactured by GMDAT." Daewoo Motor Am., 315 B.R. at 155. This argument fails.

We agree with the district court that the Distribution Agreement did not grant Daewoo America property rights in vehicles that are neither manufactured

16

nor sold by Daewoo Korea. The "terms of the contract suggest only that [Daewoo America] had the exclusive right to sell or distribute the 'Products' of 'Seller' (that is, [Daewoo Korea]) and that [Daewoo America] had the exclusive right to distribute Daewoo vehicles (not Suzuki or Chevrolet vehicles) in the United States." Daewoo Motor Am., 315 B.R. at 155. The rights of Daewoo America under the Distribution Agreement did not extend to the manufacturing assets of Daewoo Korea transferred by the MTA.

Even under California law, which Daewoo America contends applies, we would affirm the district court. Although, as Daewoo America argues, under California law, whether a "contract is reasonably susceptible to a party's interpretation can be determined from . . . extrinsic evidence," Cedars-Sinai Medical Center v. Shewry, 41 Cal. Rptr. 3d 48, 60 (Cal. Ct. App. 2006), even considering the extrinsic evidence offered by Daewoo America, the Distribution Agreement is not reasonably susceptible to an interpretation that would give Daewoo America any rights in the vehicles manufactured by GMDAT and sold by Chevrolet and Suzuki. The district court correctly concluded that the order of the Korean court approving the Modified Reorganization Plan of Daewoo Korea did not affect any property interest of Daewoo America and did not violate the automatic stay.

17

*B. The District Court Did Not Abuse Its Discretion by Granting
Comity to the Order of the Korean Court.*

Comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." Hilton v. Guyot, 159 U.S. 113, 164, 16 S. Ct. 139 (1895). To determine whether comity is appropriate, we evaluate three factors: "(1) whether the foreign court was competent and used 'proceedings consistent with civilized jurisprudence,' (2) whether the judgment was rendered by fraud, and (3) whether the foreign judgment was prejudicial because it violated American public policy notions of what is decent and just." Ungaro-Benages, 379 F.3d at 1238. Courts also consider whether "the central issue in dispute is a matter of foreign law and whether there is a prospect of conflicting judgments." Id. In matters concerning bankruptcy "the extension of comity 'enables the assets of a debtor to be dispersed in an equitable, orderly, and systematic manner, rather than in a haphazard, erratic or piecemeal fashion.'" Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana, SA de CV, 347 F.3d 589, 594 (5th Cir. 2003) (quoting Cunard S.S. Co. v. Salen Reefer Servs. AB, 773 F.2d 452, 457-58 (2d Cir. 1985)).

Daewoo America argues that the decision of the district court to grant

18

comity to the Korean order is flawed in four respects. First, Daewoo America argues that it did not have an opportunity to be heard on the claims that are raised in the current litigation and that it was not provided with adequate notice regarding the Modified Reorganization Plan. Second, Daewoo America argues that the application of comity in this case violates the public policy of the United States. Third, Daewoo America argues that the prejudice its creditors in the United States outweighs any arguments in favor of comity. Fourth, Daewoo America argues that comity should be denied because the Korean court would not grant comity to a decision of the United States. All of these arguments fail.

The district court did not clearly err when it found that Daewoo America had notice of the proceedings in the Korean bankruptcy and an opportunity to participate in those proceedings. The record, which contains multiple notices received by Daewoo America and evidence of the participation of Daewoo America in the bankruptcy process, supports that finding. The argument of Daewoo America that its claims against the defendants were not heard does not refute that Daewoo America had notice of and participated in the Korean bankruptcy proceedings. Moreover, the record supports the conclusion of the district court that the notice received by Daewoo America was adequate. The record evidences that Daewoo America received notice of all the main events of

19

the bankruptcy proceedings, including the final meeting of the creditors on September 30, 2002, to vote on the Modified Reorganization Plan. Daewoo America chose not to attend the meeting, and Daewoo America did not either vote by proxy on or otherwise object to the Modified Reorganization Plan.

Daewoo America has not identified any "public policy notion[] of what is decent and just" that is offended by the application of comity to the Korean bankruptcy order. Ungaro-Benages, 379 F.3d at 1238. The district court did not abuse its discretion when it determined that the interests of Korea in regulating business activity on its shores and the interests of the courts in dispersing a debtor's assets equitably and systematically outweighed the prejudice to Daewoo America, see Int'l Transactions, Ltd., 347 F.3d at 594, and reciprocity is not an absolute precondition to comity, see Remington Rand Corp.–Del. v. Bus. Sys. Inc., 830 F.2d 1260, 1273 (3d Cir. 1987). The argument of Daewoo America also ignores that "the interest of the system as a whole—that of promoting 'a friendly intercourse between the sovereignties,'—also furthers American self-interest, especially where the workings of international trade and commerce are concerned." In re Maxwell Communication Corp., 93 F.3d 1036, 1053 (2d Cir. 1996) (internal citation omitted). Under The Treaty of Friendship, Commerce and Navigation Between the United States of America and The Republic of Korea, 8 U.S.T. 2217,

20

in fact, a Korean judgment is elevated to the status of a sister state judgment. See

Vagenas v. Continental Gin Co., 988 F.2d 104, 106 (11th Cir. 1993). The district

court did not abuse its discretion when it granted comity to the order of the Korean

court.

C. *The District Court Did Not Abuse Its Discretion When It Found that the Claims of Daewoo America Were Intertwined with the Order of the Korean Court.*

Daewoo America next argues that the scope of the comity granted to the

order of the Korean court should not extend to its claims against the defendants

because those claims were not and could not have been raised in the Korean

bankruptcy proceeding. Daewoo America argues that because its claims did not

exist at the time of the Korean bankruptcy filing, they did not "arise out of the

same nucleus of operative fact, [and were not] based upon the same factual

predicate, as the Plan Approval Order," and were not necessarily put at issue by the

Korean proceedings. These arguments fail.

The claims of Daewoo America arise out of the same nucleus of operative

facts considered by the Korean court. The claims of Daewoo America are based on

the Modified Reorganization Plan and MTA, which were approved by the Korean

court. The validity of the MTA was necessarily put at issue in the Korean

proceedings and necessarily approved by the order of the Korean court. The

complaint of Daewoo America regarding the effect of the MTA should have been

21

raised before the Korean court. Daewoo America cannot now collaterally attack that order by bringing claims against the recipients of the property transferred based on the approval by the Korean court.

The collateral nature of the claims of Daewoo Korea is made more apparent by its request for relief. On eleven of fourteen claims, the relief sought is an injunction against the defendants. On another claim, the relief sought is that the "transfer be set aside." Because granting the relief sought would require the court to set aside the asset transfer to the defendants, which was approved by the Korean court, the complaint is a collateral attack on the order of the Korean court. See Miller v. Meinhard-Commercial Corp., 462 F.2d 358, 360 (5th Cir. 1972) ("Even though an action has an independent purpose and contemplates some other relief, it is a collateral attack if it must in some fashion overrule a previous judgment.").

The reliance of Daewoo America on In re Piper Aircraft Corp, 244 F.3d 1289 (11th Cir. 2001), and La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V., 914 F.2d 900 (7th Cir. 1990), is misplaced. In In re Piper Aircraft, this Court concluded that the complaint of Kaiser Aerospace and Electronics Corp. against Teledyne Industries, Inc. for breach of contract, breach of fiduciary duty, and constructive trust, was not barred by res judicata because "the facts underpinning the . . . action (i.e., Teledyne's alleged breach of [contract] and its fiduciary duties

22

to Kaiser) were not at issue in the confirmation proceeding." 244 F.3d at 1297. In contrast, the facts underpinning the complaint of Daewoo America against the defendants were at issue in the Korean proceeding because those facts relate to the approval of the Modified Reorganization Plan and the MTA. The claims of Daewoo America rely entirely on the alleged invalidity of the transactions approved by the Korean court.

Second, La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V. is inapposite. In La Preferida, the Seventh Circuit concluded that the suit of La Preferida against Cerveceria Modelo for tortious inference with a contract between La Preferida and Corona was not barred by the entry of a consent judgment in the bankruptcy proceedings of Corona. La Preferida, 914 F.2d at 907. The court concluded that the consent judgment was ambiguous and applied the general rule forbidding the application of collateral estoppel to consent judgments. Id. In contrast with La Preferida, the district court did not apply comity to bar the claims of Daewoo America because of a consent judgment. The district court dismissed the claims of Daewoo America because the relief sought by Daewoo America undermined the orders of the Korean court regarding the reorganization of Daewoo Korea.

This case is more akin to Miller v. Meinhard-Commercial Corp., in which Miller, a creditor in a bankruptcy proceeding, sued Meinhard-Commercial, another

23

creditor, for fraud nine months after the bankruptcy plan had been confirmed. Miller alleged that he had been fraudulently induced to acquiesce in the bankruptcy plan. 462 F2d. at 359. The court rejected Miller's suit as a collateral attack upon the bankruptcy proceedings:

> Through his fraud action, Miller is indirectly asserting that the Chapter XI proceeding should never have been approved and that a Chapter X procedure should have been decreed instead. The suit obviously turns upon what could or should have happened in the bankruptcy proceeding. It is specious to argue that Miller's action in fraud is unrelated or only coincidentally related to the merits of the bankruptcy proceeding.
> . . . .
> . . . The very gist of this suit is the allegation that the arrangement was somehow improper. To sanction it would be in effect to reopen the bankruptcy proceedings and retry the merits in a collateral proceeding.

Id. at 360-61.

The complaint of Daewoo America, likewise, turns on what happened in the Korean bankruptcy proceeding and is inextricably intertwined with the order of the Korean court. In effect, Daewoo America seeks to redistribute the assets that were transferred with the approval of the Korean court. The district court did not abuse its discretion when it dismissed the claims of Daewoo America on the ground of comity.

> D. *The California Bankruptcy Court Did Not Err when It Dismissed with Prejudice the Claim of Daewoo America for Unjust Enrichment.*

24

The final argument of Daewoo America is that the California bankruptcy court erred when it dismissed the claim of Daewoo America for unjust enrichment without leave to amend. Under California law, a quasi-contract claim for unjust enrichment cannot lie when there is a written contract that covers the same subject matter. Cal. Med. Ass'n, Inc. v. Aetna U.S. Healthcare of Cal., Inc., 114 Cal. Rptr. 2d 109, 125 (Cal. Ct. App. 2001). Because all the claims of Daewoo America, including the unjust enrichment claim, rely on the existence of a written contract, amendment would be futile and the California bankruptcy court did not err when it dismissed the unjust enrichment claim without leave to amend.

## IV. CONCLUSION

The dismissal of the complaint of Daewoo America is

**AFFIRMED.**

25

TJOFLAT, Circuit Judge, specially concurring:

I concur in the judgment of the court, but I write separately because I do not believe that international comity entirely disposes of Daewoo America's Amended Complaint. Contrary to the court's decision, Daewoo America's entire lawsuit does not "turn[] on what happened in the Korean bankruptcy proceeding," ante at 25, nor is it "inextricably intertwined with the order of the Korean court," id. For the vast majority of Daewoo America's claims, the proceedings before the Korean bankruptcy court serve as little more than a factual backdrop. When properly understood, most of Daewoo America's claims solely concern the defendants' dealings with Daewoo America, separate and distinct from the transfer of Daewoo Korea's manufacturing assets to GM and its partners. Stated differently, this dispute simply is not part of the Korean bankruptcy, and granting international comity to the Korean bankruptcy court's orders does little to resolve it. The district court therefore could not have dismissed Daewoo America's entire Amended Complaint on the ground of international comity. In my view, analyzing the claims presented in the Amended Complaint, a task on which the court expends little effort, is the proper way to decide this appeal. Doing so reveals that the premises on which those claims rest are flawed, and that each claim in the

26

Amended Complaint should be dismissed.[1]

Part I of the following discussion outlines the course of dealing between Daewoo America and GM. In its discussion of the facts underlying this dispute, the court chooses to focus mostly on the proceedings in the Korean bankruptcy court. While I have no quarrel with the accuracy of this account, I believe that providing more detail on the defendants' (and particularly GM's) alleged conduct vis-à-vis Daewoo America is required fully to understand this case. Part II discusses Daewoo America's claims in detail, and illustrates that most of them do not put the validity of the Korean bankruptcy proceeding in issue. Part III groups and analyzes those remaining claims, revealing them to be groundless. Part IV briefly concludes.

I.

Daewoo America was the seller, distributor and warranty provider of Daewoo automobiles in North America. On November 18, 1999, Daewoo America and Daewoo Korea, its parent company, entered into the Distribution Agreement. The Distribution Agreement states, in relevant part:

---

[1] I therefore would affirm the district court's disposition of this case which is why I concur in the judgment of the court. See Bonanni Ship Supply, Inc. v. United States, 959 F.2d 1558, 1561 (11th Cir. 1992) ("[T]his court may affirm the district court where the judgment entered is correct on any legal ground regardless of the grounds addressed, adopted or rejected by the district court.").

27

Whereas, Seller [Daewoo Korea] is the exclusive worldwide distributor of the Products (as defined in Section 1), which are manufactured by Seller;

Whereas, Seller, as exclusive worldwide distributor has the right to grant to others the exclusive right to sell the products [sic] in certain regions, including the Territory (as defined in Section 2);

. . .

. . . Seller hereby agrees to sell to Buyer [Daewoo America] and Buyer hereby agrees to purchase from Seller the Products for resale or for rental or lease in the Territory. For purposes of this Agreement, "Products" shall mean the motor vehicles provided on Exhibit A attached hereto (as said Exhibit A may be amended from time to time by Seller to add or delete motor vehicle models) and the parts, accessories and equipment therefor, together with any warranty provided by the Seller at no cost to Buyer.[2]

. . .

Seller hereby grants to Buyer the exclusive right to distribute, sell, rent, lease and otherwise dispose of (collectively "Sell") and service, directly or through one or more subsidiaries or independent contractors, the Products in the United States and all territories and possessions thereof (collectively, "Territory"). Seller shall not Sell or service, directly or indirectly, or permit any other person or corporation, partnership, limited liability company or their entity to Sell or service the Products in the Territory.

Doc. 144, Ex 7. The term of the agreement was ten years (unless terminated under certain conditions), and would automatically renew every five years unless either party specified otherwise. Daewoo Korea manufactured the vehicles and parts it delivered to Daewoo America at its plants in South Korea and Vietnam (the "Daewoo Korea Plants").[3]

---

[2] Although the Distribution Agreement states that the "Products" covered by the agreement are enumerated in an attached "Exhibit A," the district court found, and the litigants agreed, that no such exhibit ever existed.

[3] According to the Amended Complaint, the plants ultimately sold to GM and transferred to GMDAT "included those located in Changwoon and Kunsan, South Korea, and another located in Hanoi, Vietnam," and that GM also had "an obligation to acquire, pending the

28

Daewoo Korea filed for bankruptcy in South Korea in November 2000. The record makes clear that Daewoo America was fully aware of Daewoo Korea's financial distress, and knew that Daewoo Korea was negotiating the sale of a substantial portion of its assets to GM. Moreover, Daewoo America was on notice that those assets included the Daewoo Korea Plants. In a November 9, 2000 letter to its employees, Daewoo America stated that "under creditor and court imposed receivership, Daewoo Motor Korea is solidly positioned to proceed with concluding the transition of the company to a new owner on an accelerated basis, such as the possibility of General Motors." Doc. 123, Ex. 7. Around this time, Daewoo America claims that GM, without its knowledge, entered into negotiations with Suzuki for the purpose of forming an acquisition partnership for Daewoo Korea's assets. Am. Compl. ¶ 28.

Daewoo America alleges that GM promised to continue using it as the distributor of Daewoo vehicles and parts in the United States after it completed its acquisition of Daewoo Korea's assets. Am. Compl. ¶ 34. Daewoo America further claims that, in reliance on this alleged promise, it initially continued to expand its dealership network by entering into new dealership agreements. Id. at ¶ 35.

---

satisfaction of certain conditions, or the waiver of those conditions by [GMDAT], the Daewoo Korea plant in Bupyong, South Korea." Am. Compl. ¶ 51.

On September 20, 2001, Daewoo Korea (and its bankruptcy receiver) entered into a non-binding Memorandum of Understanding (the "MOU") with GM. The MOU provided that certain Daewoo Korea domestic and foreign assets, including several manufacturing facilities, would be transferred to and controlled by a newly-formed company owned by GM and a consortium of investors (later named "GMDAT"). According to Daewoo America, it was listed among the sale assets described in the MOU. On September 26, 2001, the Korean bankruptcy court approved the MOU. At subsequent due diligence meetings between Daewoo America and GM, Daewoo America claims that GM specifically asked it temporarily to halt the appointment of new Daewoo dealers, because GM would be in a position to assist it in identifying new dealers once the acquisition closed. Am. Compl. ¶ 38.

Daewoo America claims that, at a November 9, 2001 meeting in Seoul, South Korea, GM again indicated that it would continue to be the primary distributor of Daewoo vehicles in North America. In reliance on these and other statements made by GM, Daewoo America claims that it refrained from adding new dealers to its network and continued to accumulate inventory at its ports. Am. Compl. ¶ 40. Daewoo America also purportedly secured GM's verbal promise that it would not "rebadge" the Daewoos it manufactured at the Daewoo Korea Plants.

30

Id.  The effect of such rebadging, presumably, would be to cut Daewoo America out of the distribution chain, because the Distribution Agreement authorized Daewoo America to sell and distribute vehicles under the Daewoo brand, and no others.

Daewoo America also asserts that during an automotive convention in or around January 2002, it had a display booth next to that of GM and GM's financing arm, which "strongly implied the forthcoming anticipated alliance of [Daewoo America] with GM."  Am. Compl. ¶ 42.  Moreover, GM executives represented to Daewoo America during that convention that they looked forward to a working relationship between the two companies.  Id.

Despite all of these promises from GM, Daewoo America still felt it necessary to express its "extreme concerns about the far reaching negative implications of the possible exclusion of [Daewoo America]'s U.S. operations from the agreements associated with General Motors' pending acquisition of certain assets of Daewoo Korea" in a letter dated March 27, 2002 to GM's senior executives.  In Daewoo America's view, these concerns "include[ed] the potential breach arising from the [Distribution Agreement] between Daewoo Korea and [Daewoo America]."  Doc. 124 Ex. 21 at DMA000071.

On April 30, 2002, Daewoo Korea and GM executed the Master Transaction

31

Agreement ("MTA").  The agreement created GMDAT, which received certain of Daewoo Korea's assets, including the Daewoo Korea Plants.  On September 12, 2002, Daewoo Korea filed a modified reorganization plan (the "Modified Plan"), which incorporated the terms of the MTA.  Daewoo America was not among the assets sold in the transaction.  The MTA also permitted the sale of Daewoo-brand vehicles throughout the world, and allowed vehicles manufactured at the Daewoo Korea Plants to be sold in the North America under non-Daewoo brand names.  In 2003, after the asset sale closed, GM and Suzuki announced that they would begin exporting vehicles manufactured at the Daewoo Korea Plants to the United States for sale under the Chevrolet and Suzuki brands.

Daewoo America's financial difficulty – much of which it blames on the defendants' purported misrepresentations and conduct – led it to seek Chapter 11 bankruptcy relief in the United States Bankruptcy Court for the Central District of California on May 16, 2002.  As part of the bankruptcy filing, an automatic stay under 11 U.S.C. § 362(a) was put in place, which froze Daewoo America's assets, brought them under the control of the bankruptcy court, and barred any other persons or entities from attempting to obtain possession of or exercise control over them.[4]  Daewoo America thereafter instructed its United States and Korean counsel

---

[4] "Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor

to explore potential causes of action arising out of Daewoo Korea's asset sale. It also communicated to the California bankruptcy court its full intention "to pursue litigation" against Daewoo Korea, GM, "and other parties relating to the sale of assets of Daewoo Korea to a consortium consisting of GM and certain creditors of Daewoo Korea." Doc. 125, Ex. 28. Daewoo America never notified the Korean bankruptcy court, or any other Korean Court, of its concerns with respect to GM's conduct.[5]

On July 22, 2003, Daewoo America commenced an adversary proceeding in the California bankruptcy court by filing a multi-count complaint (the "Original Complaint") against GM, GMDAT, Suzuki and American Suzuki. Reduced to its essentials, the Original Complaint alleged that (1) Daewoo America reasonably relied on GM's misrepresentations, and (2) this gave GM and its partners the opportunity to supplant Daewoo America as the exclusive distributor of Daewoo automobiles in the United States. This outcome, according to Daewoo America, was fraudulent, and resulted in, among other things, injury to competition and

---

Protection Act of 1970, operates as a stay, applicable to all entities, of . . . any act to obtain possession of property of the [bankruptcy] estate or of property from the estate or to exercise control over property of the estate . . . ." 11 U.S.C. § 362(a)(3).

[5] The "proof of claim" to which the court refers, ante at 4, was against Daewoo Korea for various charges related to their parent/subsidiary relationship. These charges had nothing to do with the defendants or the claims in this lawsuit. Likewise, the complaint filed by Daewoo America against Daewoo Korea and its receiver, which it subsequently dismissed, did not involve the defendants' conduct. Ante at 5.

33

unjust enrichment of the defendants.[6]  To salve its injuries, Daewoo America requested both damages and injunctive relief.  In further pursuit of its prayer for injunctive relief, Daewoo America moved the court to issue a temporary restraining order preventing the defendants from importing the Chevrolets and Suzukis manufactured at the Daewoo Korea Plants.  The California bankruptcy court denied the motion.  GM and Suzuki thereafter moved the court to dismiss most of Daewoo America's claims pursuant to Federal Rule of Civil Procedure 12(b)(6).  The California bankruptcy court denied the motions in part and granted them in part with leave to amend.

On November 20, 2003, Daewoo America filed an Amended Complaint,[7]

---

[6] Daewoo America's Original Complaint contained eleven counts or "claims."  It is unnecessary to detail the allegations of these claims because, with the exception of its claim sounding in "unjust enrichment," which the California bankruptcy court dismissed for failure to state a claim for relief, they were replicated by the claims asserted in the Amended Complaint.

[7] The Amended Complaint, a typical "shotgun pleading" containing multiple counts, each incorporating by reference all the (usually irrelevant) allegations of previous counts, see Strategic Income Fund, LLC v. Spear, Leeds & Kellogg Corp., 305 F.3d 1293, 1295 n.9 (11th Cir. 2002), includes the following fourteen claims: (1) Fraud against GM; (2) Tortious Interference with Contract against GM; (3) Tortious Interference with Prospective Economic Advantage against GM; (4) Aiding and Abetting Breach of Fiduciary Duty against GM; (5) Violation of the Cartwright Act against all defendants; (6) Unfair Competition against all defendants; (7) Successor Liability against GMDAT; (8) Unauthorized Post-Petition Transfer (11 U.S.C. § 549) against all defendants (9) Violation of the Automatic Stay (11 U.S.C. § 362) against all defendants; (10) Violation of the Automatic Stay (11 U.S.C. § 362) against GM; (11) Constructive Termination of the Distribution/Franchise Agreement (Fla. Stat. § 320.641) against all defendants; (12) Illegal Conduct Related to Motor Vehicle Business (Fla. Stat. § 320.64(4)) against GM; (13)  Termination of the Distribution Agreement (Mass. Stat. 93B § 4(c)(12)) against GM, and; (14) Constructive Termination of the Distribution Agreement (Mass. Stat. 93B § 5) against all defendants.  These claims are described in full in the text, infra.

34

which added several claims but was otherwise based on the same conduct alleged in the Original Complaint.[8]  GM, GMDAT, and American Suzuki moved the bankruptcy court for dismissal pursuant to Rule 12(b)(6).  The court denied GM's motion as to the First, Second, Third and Fourth Claims.  The court granted the motions without leave to amend as to the Fifth, Sixth, Thirteenth and Fourteenth Claims.  The court also granted the motions with respect to the Eleventh and Twelfth Claims, but with leave to amend.  To determine Daewoo America's rights under the Distribution Agreement, and to consider whether the Korean bankruptcy court's approval of the asset sale should be accorded international comity, the court deferred ruling on the motions to dismiss Daewoo America's Seventh, Eighth, Ninth and Tenth Claims.  In so doing, the court recongized the possibility that a judgment for Daewoo America on these claims could constitute a collateral attack on the Korean bankruptcy court's orders.

---

[8]  The court states that "[o]n eleven of fourteen claims, the relief sought [by Daewoo America] is an injunction against the defendants," and "[o]n another claim, the relief sought is that the transfer must be set aside."  Ante at 23 (internal quotation omitted).  While in a sense true, this observation is somewhat misleading.  Daewoo America did ask for injunctive relief on eleven of its claims, but it also asked for damages on thirteen of them.  In fact, it asked exclusively for damages in two claims, whereas it asked exclusively for an injunction in only one.  Curiously, the court neglects to mention any of this.  I can only conclude that its omission was calculated to bolster its argument that giving Daewoo America the relief it has requested would require us to unwind the asset sale to GM, and would also require us to invalidate the Korean court's orders and proceedings.  Awarding Daewoo America damages pursuant to its claims, however, would do nothing to disturb GM's ownership interest in GMDAT, nor would it affect GMDAT's continued control of the Daewoo Korea Plants and other assets.

35

Before the bankruptcy court could hear argument on the international comity issue, the Judicial Panel on Multidistrict Litigation (the "JPML") transferred the proceeding to the United States District Court for the Middle District of Florida, where several Daewoo automobile dealerships had filed suit against GM, GMDAT and American Suzuki.[9] That court, like the California bankruptcy court before it, instructed the parties to submit supplemental briefs on whether international comity should bar Daewoo America's claims. After an August 20, 2004 hearing, the court entered an order dismissing the Amended Complaint with prejudice.[10]

The district court made two broad rulings. First, it concluded that the asset sale to GM did not violate the automatic stay put in place by Daewoo America's bankruptcy, because the Distribution Agreement gave Daewoo America no property rights in Daewoo Korea's assets. In other words, Daewoo America did not own any of the property Daewoo Korea sold to GM and its partners. Additionally, the Distribution Agreement did not support Daewoo America's contention that it had a perpetual right sell and distribute cars manufactured in the

---

[9] In claims similar to those filed by Daewoo America, several Daewoo dealerships accused GM, GMDAT and American Suzuki of being responsible for terminating the supply of Daewoo vehicles and parts that Daewoo Korea exported to the United States. The district court dismissed the dealerships' complaint with prejudice on January 6, 2005. In re Daewoo Motor Co. Ltd. (Dealership Litigation), No. JPML-1510, January 6, 2005.

[10] In its order, the court made no mention of the California bankruptcy court's dispositive rulings on the merits of Daewoo America's claims. I can only assume that the court ruled as though it had the entire Amended Complaint before it, and thus dismissed the Amended Complaint in its entirety.

36

Daewoo Korea Plants, regardless of who owned those plants and regardless of the branding of those cars. Its rights pertained specifically and exclusively to cars sold by Daewoo Korea under the Daewoo brand. Second, the court found that the remainder of Daewoo America's claims functioned as a collateral attack on the Korean bankruptcy court's orders approving the sale of Daewoo Korea's assets to GM. To avoid review of the Korean proceedings, and to accord them due respect, the court declined to exercise its jurisdiction on the grounds of international comity. The court concluded that doing so was appropriate because: (1) there is little difference between United States and Korean bankruptcy law; (2) Korea had a significant interest in the reorganization of Daewoo Korea, and; (3) Daewoo America was notified of and fully participated in the reorganization proceedings but chose not to oppose them.[11] Daewoo America moved the court to clarify and

---

[11] Pursuant to Federal Rule of Civil Procedure 12(b), a district court generally must convert a motion to dismiss into a Rule 56 motion for summary judgment if the court considers materials outside of or not attached to the complaint. Day v. Taylor, 400 F.3d 1272, 1275-76 (11th Cir. 2005). Under most circumstances, such material would not be part of the record underpinning a Rule 12(b)(6) ruling. Harris v. Ivax Corp., 182 F.3d 799, 802 n.2 (11th Cir. 1999) (citing 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357, at 299 (2d ed. 1990)). Here, the district court's dispositive order made reference to several documents, such as the Distribution Agreement and the MTA, that were not attached to the Amended Complaint. Nevertheless, "[o]ur prior decisions also make clear that a document need not be physically attached to a pleading to be incorporated by reference into it; if the document's contents are alleged in a complaint and no party questions those contents, we may consider such a document" if that document is central to the plaintiff's claims. Day, 400 F.3d at 1276 (citing Ivax Corp., 182 F.3d at 802 n.2). Clearly, the Distribution Agreement and the MTA are integral to the allegations contained in Daewoo America's Amended Complaint. Additionally, no party has contested the contents or authenticity of those documents. It was therefore unnecessary for the district court to convert the defendants' motions to dismiss into motions for summary

37

reconsider its decision.  The court denied the motion and entered final judgment for

GM and the other defendants.  This appeal followed.

II.

As previously indicated, the Amended Complaint contains fourteen claims.

Each is directed at the conduct of GM and the other defendants.  In my view, only

claims Four, Eight, Nine, and Ten, which I discuss in subsection II.B., necessarily

implicate the validity of the Korean bankruptcy court's proceedings and orders.

The remaining ten claims, by contrast, concern the defendants' conduct separate

and apart from those proceedings and orders.

A.

The First Claim sounds in fraud.[12]  The claim is that GM falsely represented

that it would continue Daewoo Korea's distribution relationship with Daewoo

America; that Daewoo America would have the exclusive right to sell and

distribute the vehicles made at the Daewoo Korea Plants now operated by

GMDAT; that Daewoo America reasonably relied on GM's misrepresentation to

its detriment by foregoing its right to file a claim against Daewoo Korea during the

Korean bankruptcy proceedings, or to otherwise oppose that court's approval of

---

judgment.
[12] For claims One through Four, and for Claim Seven, Daewoo America does not identify which state's law applies.

the asset sale; and that Daewoo America continued to purchase Daewoo Korea parts and to add dealerships to its network of dealers, based on its expectation that GM would keep its word.

The Second Claim, Tortious Interference with Contract against GM, is that Daewoo America's contracts have been interrupted "as a result of GM's acquisition" of the Daewoo Korea Plants. Daewoo America accuses GM of intentionally interfering with Daewoo Korea's performance of the Distribution Agreement (i.e., Daewoo Korea's delivery of cars) and, by extension, interfering with Daewoo America's ability to provide its dealerships with cars. The tort alleged here is not the GM acquisition itself; the validity of the acquisition is not questioned. Rather, at issue is the termination of Daewoo America's car supply, and GM's role and intention in bringing about that termination. Put another way, it is the goal of the acquisition that is at issue, with Daewoo America insisting that GM purchased the Daewoo Korea assets specifically to cause it economic harm. The acquisition is merely the vehicle by which GM fulfilled its tortious purpose.

The Third Claim is that GM tortiously interfered with Daewoo America's "Prospective Economic Advantage," which is described as the expected expansion of Daewoo America's distribution and servicing network. Again, Daewoo America focuses on GM's statements – in particular, GM's request that Daewoo

39

America cease entering into new dealership agreements. Daewoo America in effect claims that GM promised to assume Daewoo Korea's performance of the Distribution Agreement and that it relied on the promise and complied with GM's request. In Daewoo America's view, GM's promise caused it to forego the expansion of its dealership network and, resultantly, to forego the profit it would have realized through that network expansion.

Daewoo America's Fifth Claim is that the all of the defendants violated California's Cartwright Act,[13] an antitrust statute; they "conspired, combined, and entered [into] agreements to limit or reduce production, or increase the price, or prevent" Daewoo America from competing in the distribution and sale of Daewoos. Although Daewoo America acknowledges that the "Master Transaction Agreement operates to eliminate competition," and that the agreement supplants its distribution rights, it focuses more on what the defendants did after they began to import Daewoos for sale in the United States. The defendants have cut off its supply of cars, and have been distributing the cars Daewoo America believes it should be distributing. Daewoo America attacks not the MTA, but the defendants' use of the assets the MTA provided. In other words, Daewoo America believes that the defendants have used these assets for an illegal, anticompetitive purpose,

---

[13] Cal. Bus. & Prof. Code § 16720 et seq.

40

whether those assets were acquired validly or not.

The Sixth Claim, Unfair Competition under California law, is a "catch-all" cause of action, which incorporates the First through the Fifth claims and all of the defendants' conduct described in the Amended Complaint.[14] Daewoo America alleges that the defendants have caused its business to be "substantially impaired or destroyed" and that it has "no adequate remedy at law" for its injuries. As indicated above, Daewoo America finds fault in much of the defendants' conduct, most of which was not material to the issues litigated in the Korean bankruptcy.

Daewoo America's Seventh Claim, Successor Liability against GMDAT, is that Daewoo Korea executed the sale of its assets "for the fraudulent purpose of escaping [its] debts and liabilities to [Daewoo America]." Among those unpaid debts and liabilities was Daewoo Korea's obligation under the Distribution Agreement to supply Daewoo America with cars for sale and distribution in the

---

[14] Daewoo America cites Cal. Bus. & Prof. Code § 17200 et seq. as the basis for its unfair competition claim. Unfair competition under this section includes "any unlawful, unfair or fraudulent business act or practice." Gregory v. Albertson's, Inc., 128 Cal. Rptr. 2d 389, 392 (Cal. Ct. App. 2002) (internal quotation marks omitted). A business act is "unlawful" if it is forbidden by law. Walker v. Countrywide Home Loans, Inc., 121 Cal. Rptr. 2d 79, 86 (Cal. Ct. App. 2002). An act is "unfair" if it is "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co., 973 P.2d 527, 544 (Cal. 1999). "In effect, the UCL [California's Unfair Competition Law] borrows violations of other laws . . . and makes those unlawful practices actionable under the UCL." Lazar v. Hertz Corp., 82 Cal. Rptr. 2d 368, 375 (Cal. Ct. App. 1999).

United States. Because GMDAT ran Daewoo Korea's automotive manufacturing business both before and after the acquisition, received Daewoo Korea's assets, and continued to employ many of Daewoo Korea's workers, GMDAT is Daewoo Korea's successor-in-interest. As such, "GMDAT is liable . . . to the same extent as Daewoo Korea." Though obvious, it is worth emphasizing that this claim is directed at GMDAT, not Daewoo Korea. Far from attacking the validity of the Korean bankruptcy court's proceedings and the resultant asset sale, this Seventh Claim is simply seeking to enforce the bankruptcy court's order.[15]

The Eleventh Claim, Constructive Termination of the Distribution Agreement under Florida law,[16] is that GM's acquisition of the Daewoo Korea Plants and the defendants' sale in the United States of the vehicles manufactured at those plants operated to terminate the Distribution Agreement and Daewoo America's agreements with its Florida automotive dealers. Like the Second and Fifth Claims, this claim rests on what happened after GM and its partners

---

[15] While Daewoo America does claim that Daewoo Korea acted fraudulently during the asset sale process, this is basically immaterial to its claim. Daewoo America is not trying to upset the bankruptcy order. Rather, it believes GMDAT has an obligation to Daewoo America that survives bankruptcy and is attempting to enforce it.

[16] Daewoo America failed to specify the statutory subsection that formed the basis for this claim. It nevertheless appears that Daewoo America based this claim on Fla. Stat. § 320.641(1)(b)(3), which proscribes the "unfair" termination of a franchise agreement. Such termination is unfair if "it is not clearly permitted by the franchise agreement; is not undertaken in good faith; is not undertaken for good cause; or is based on an alleged breach of the franchise agreement which is not in fact a material and substantial breach; or if the grounds [for termination] have not been applied in a uniform and consistent manner by the licensee."

42

purchased the Daewoo Korea Plants, and not on the invalidity of the acquisition itself. Again, Daewoo America focuses on the "rebadging" of Daewoos manufactured in the Daewoo Korea Plants, which the defendants market and sell in the United States, and the termination of its supply of cars for sale and distribution in the same geographic market. The validity of the asset sale has no bearing on the legal sufficiency of this claim.

The Twelfth and Thirteenth claims are statutory, Illegal Conduct Related to a Motor Vehicle Business under Florida law,[17] and Constructive Termination of the Distribution Agreement Against GM under Massachusetts law.[18] GM's overall conduct caused Daewoo America to suffer a pecuniary loss or other adverse affect in carrying out its business. As is the case with the Sixth Claim, Daewoo America supports these claims by referring to conduct completely separate from that involved the Korean bankruptcy court's proceedings.

The Fourteenth Claim, Constructive Termination of the Distribution

_____

[17] Fla. Stat. § 320.64(4) permits the revocation of a motor vehicle dealer's license to operate in the state if that dealer "has indulged in any illegal act relating to his or her business" with such frequency as to establish a pattern of wrongdoing. This subsection also allows any motor vehicle dealer harmed by another's violation of the subsection to seek legal and equitable remedies against the offender. See Fla. Stat. §§ 320.695, 320.697.

[18] Daewoo America cites Mass. Gen. Laws ch. 93B, § 4(c)(12) as the basis for its Thirteenth Claim. This provision makes it illegal for vehicle manufacturers, distributors and franchisors "to act to accomplish, either directly or indirectly through any parent company, subsidiary, or agent, what would otherwise be prohibited under this chapter on the part of the manufacturer or distributor."

43

Agreement,[19] is directed against all of the defendants and is substantially similar to the Second Claim. It alleges that the defendants, by refusing to supply Daewoo America with the cars manufactured in the Daewoo Korea Plants, and by selling and distributing those cars in the United States themselves, have effectively terminated both the Distribution Agreement and Daewoo America's agreements with its dealers. Like the Second Claim, Daewoo America puts the defendants intent in issue; they purchased the Daewoo Korea Plants for the purpose of terminating Daewoo America's agreements with malice or in bad faith.

Daewoo America's factual allegations can be separated into two categories. The first consists of the defendants' "promise" that Daewoo America would have a role in the post-transfer, post-Daewoo Korea period; it would distribute the cars manufactured at the Daewoo Korea Plants. Daewoo America relied on this promise. The promise went for naught, however, when GM and Suzuki agreed that the cars produced at those plants would be rebadged and distributed by Suzuki. The second category assumes that the defendants eliminated Daewoo America's vehicle supply for anticompetitive purposes, led Daewoo Korea to shirk its delivery responsibilities under the Distribution Agreement, and refused to take on

---

[19] Daewoo America cites Mass. Gen. Laws ch. 93B, § 5 as the basis for this claim. It is illegal under this statute for a manufacturer, distributor or franchisor to, among other things, terminate or refuse to renew a motor vehicle dealer franchise agreement "without good cause, in bad faith, or in an arbitrary or unconscionable manner." Id. § 5(a).

44

those delivery responsibilities in Daewoo Korea's stead. Claims Six, Thirteen, and Fourteen assert conduct falling under both categories.

The district court's order provides no explanation as to how the validity of the MTA, the Korean bankruptcy court's orders, or the Korean bankruptcy proceedings might have any impact on these claims. Indeed, such validity is irrelevant to the question of whether GM's promise to make Daewoo America its United States distributor was intentionally untruthful. Likewise, such invalidity is irrelevant to the question of whether the defendants eliminated Daewoo America's vehicle supply with tortious or anticompetitve intent. Moreover, as I have explained, Daewoo America's Seventh Claim, the Successor Liability claim against GMDAT, is entirely dependent on the validity of the Korean bankruptcy proceedings; Daewoo America cannot recover against GMDAT as Daewoo Korea's successor if the transaction by which GMDAT gained that position is voided. In sum, I cannot agree with the court that addressing these claims would necessitate the review, and perhaps invalidation, of one or more of the decisions of the Korean bankruptcy court. According that court's decisions international comity simply ignores claims that are entirely foreign to that court's proceedings and jurisdiction. These claims should be dismissed on the ground that they are legally insufficient, not because international comity forecloses their consideration.

45

B.

Unlike the claims discussed above, the Fourth, Eighth, Ninth and Tenth Claims, by their nature, call the Korean bankruptcy court's orders and proceedings into question. The Fourth Claim, Aiding and Abetting Breach of Fiduciary Duty, is that Daewoo Korea, as Daewoo America's controlling shareholder, had a fiduciary duty to preserve and maximize Daewoo America's assets and to prevent the subsidiary's insolvency – for the benefit of both Daewoo America and its creditors. These assets, according to Daewoo America, included its right under the Distribution Agreement to receive cars from the Daewoo Korea Plants and to sell and distribute them in the United States. GM was aware of Daewoo Korea's fiduciary duty, but through the MTA and other agreements, provided Daewoo Korea with "substantial assistance" in breaching that duty. To grant Daewoo America relief on this claim, the court would have to find that the asset transfer itself was a tortious act, constituting a breach of Daewoo Korea's fiduciary responsibilities.

The Eighth Claim, Unauthorized Post-Petition Transfer, is brought against all of the defendants.[20] The claim is that Daewoo America's property, namely

---

[20] 11 U.S.C. § 549 states, in relevant part:
a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a

46

Daewoo America's exclusive right to sell and distribute Daewoo automobiles in the United States, was unlawfully transferred to the defendants after Daewoo America filed for bankruptcy relief in the California bankruptcy court. Similarly, the Ninth and Tenth Claims, Violation of the Automatic Stay (against all defendants and GM, respectively), assert that Daewoo America's exclusive distribution rights were given away when the automatic stay specifically forbade "any acts to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."

In each of these four claims, Daewoo America points to the asset transfer itself as the illicit conduct. It cites no additional conduct in support of these claims. The Korean bankruptcy court approved the MTA and incorporated it into Daewoo Korea's reorganization plan. Thus, Daewoo America cannot attack the MTA without also attacking the Bankruptcy court's approval of it; the two are inextricably intertwined. With respect to these claims, I therefore agree with the court that they amount to nothing more than a collateral attack on the Korean bankruptcy court's orders. Indeed, in contending that it has "no adequate remedy

---

transfer of property of the estate–
      (1) that occurs after the commencement of the case; and
      (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
      (B) that is not authorized under this title or by the court.
11 U.S.C. § 549.

at law" for the harm the asset transfer has caused and asking that "the unauthorized post-petition transfer be set aside," Daewoo America reveals that the objective of these claims is the unwinding of the asset transfer.

I am satisfied that international comity is an appropriate basis for disposing of these four claims. Given the manner in which Daewoo America has pleaded them, the district court would have no choice but to reevaluate the decisions by the Korean bankruptcy court. As the court aptly states, "granting the relief sought would require the [district] court to set aside the asset transfer to the defendants, which was approved by the Korean court." Ante at 23. Such a collateral attack should not be entertained, and the district court's abstaining from deciding the merits of these claims in no measure constituted an abuse of discretion.

### III.

I turn now to what I consider is the appropriate manner in which to address the remaining issues presented by this appeal. When deciding whether a plaintiff's claims should be dismissed, we must view the complaint in the light most favorable to the plaintiff and accept the well-pleaded facts as true. Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 1687, 40 L. Ed. 2d 90 (1974); St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am., 795 F.2d 948, 953 (11th Cir. 1986). A court "may dismiss a complaint pursuant to Federal Rule of Civil Procedure

48

12(b)(6) when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action."  Marshall County Bd. of Educ. v. Marshall County Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993) (citing Executive 100, Inc. v. Martin County, 922 F.2d 1536, 1539 (11th Cir. 1991)).

The claims in this case can be grouped into three core theories of recovery,[21] each of which turns on Daewoo America's interpretation of the Distribution Agreement.  In the first group, Daewoo America's theme is that GM, in purchasing the Daewoo Korea Plants, and the defendants, in subsequently distributing and selling vehicles and parts manufactured by those plants, misappropriated Daewoo America's distribution rights granted by the Distribution Agreement.  I label this the "Conversion Theory."  In the second group, Daewoo America asserts that the Distribution Agreement guaranteed it a continuous supply of vehicles and parts, even after GM and its partners purchased the Daewoo Korea Plants.  I label this the "Continuous Supply Theory."  In the third group, Daewoo America's theme is that it had the right to stop (or at the very least, to challenge) Daewoo Korea's sale of the Daewoo Korea Plants to GM and its partners, but gave up that right based on

---

[21] As I indicated in the previous section, Daewoo America's Sixth Claim (Unfair Competition), Twelfth Claim (Illegal Conduct Related to Motor Vehicle Business), and Thirteenth Claim (Constructive Termination of the Distribution Agreement) are, for the most part, derivative claims, for which the other illegal conduct alleged in the Amended Complaint will sustain a cause of action.  These claims are legally insufficient because Daewoo America's other claims are legally insufficient.

GM's promises. I call this the "Fraud Theory." Because I agree that international comity adequately resolves the "Conversion Theory" claims (the Fourth, Eight, Ninth, and Tenth claims of the Amended Complaint), I do not address their merits. I analyze the remaining theories in turn.

A.

The Second, Third, Fifth, Seventh, Eleventh, and Fourteenth claims rely on the Continuous Supply Theory. Daewoo America contends that the Distribution Agreement entitles it to receive and distribute vehicles from the Daewoo Korea Plants until at least 2009. From its perspective, Daewoo America still has the right to receive and distribute vehicles made in the Daewoo Korea Plants, despite the fact that Daewoo Korea no longer makes Daewoos for sale in the United States. Indeed, Daewoo America acknowledges that its distribution rights are not affected by the distribution and sale of just "any vehicle that happens to be manufactured by GMDAT or branded Chevrolet or Suzuki," only those manufactured in the Daewoo Korea Plants. Reply Brief of Appellant at 6-7 (emphasis in original) (internal quotations omitted). Moreover, when the defendants distribute those vehicles under the Chevrolet and Suzuki brands, Daewoo America insists that its right to delivery of vehicles is further denied.

The Second Claim, Tortious Interference with Contract, paints the asset

50

transfer as disruptive of the Distribution Agreement, under which Daewoo Korea had an obligation to provide Daewoo America with vehicles. The acquisition of the Daewoo Korea Plants caused Daewoo Korea to be unable to deliver cars to Daewoo America. Am. Compl. ¶ 76. This inability, in turn, interfered with Daewoo America's dealership agreements, under which the vehicles were distributed in the United States. Id. The assumption underlying this claim is that Daewoo Korea's inability to provide Daewoo America with cars, breaches the terms of the Distribution Agreement.

The Third Claim accuses GM of tortiously interfering with Daewoo America's prospective economic advantage, "through its fraudulent misrepresentations and omissions." Am. Compl. ¶ 84. GM's purported misrepresentations aside, the prospective opportunities Daewoo America claims to have lost exist only if it had a right to be supplied with vehicles after Daewoo Korea's reorganization and asset sale. In other words, absent the right to a supply of vehicles on which to build its distribution and service network, Daewoo America has no prospective business opportunities to be injured.

Daewoo America's Fifth Claim asserts that the defendants violated California's Cartwright Act, which prohibits agreements among individuals or companies that restrain or eliminate trade. See Lowell v. Mother's Cake & Cookie

51

Co., 144 Cal. Rptr. 664, 671 (Cal. App. Ct. 1978). According to Daewoo America, the defendants conspired to eliminate competition in the United States Daewoo distribution market[22] by executing the MTA (i.e., taking control of the exclusive means of Daewoo parts and vehicle production), and by depriving it of Daewoo vehicles. Am. Compl. ¶ 100.[23] This deprivation of vehicles presumably harmed Daewoo America and its consumers by freeing defendants to "prevent competition, limit or reduce production, or increase prices." Am. Compl. ¶ 106. Daewoo America posits that, by operation of law, it has the right to compete in the relevant market, which requires the defendants to supply it with vehicles.

The Seventh Claim, Successor Liability, attempts to place GMDAT in Daewoo Korea's shoes, making GMDAT responsible for Daewoo Korea's alleged breach of the Distribution Agreement. Again, Daewoo America focuses on the loss of its vehicle supply, stating that Daewoo Korea's asset transfer to GMDAT was an attempt to escape its "debts and liabilities to [Daewoo America] . . . leaving

---

[22] I assume that the United States Daewoo distribution market is a valid relevant market for the purpose of sustaining a Cartwright Act claim. See Exxon Corp. v. Superior Court, 60 Cal. Rptr. 2d 195, 201 (Cal. App. Ct. 1997) ("Ordinarily, a plaintiff [attempting to show a significant and unreasonable restraint on trade under the Cartwright Act] must delineate a relevant market and show that the defendant plays enough of a role in that market to impair competition significantly." (citation omitted) (internal quotation marks omitted)).

[23] To the extent Daewoo America challenges the purchase of the assets as anticompetitive, this is a claim that should have been raised during the course of the Korean bankruptcy proceeding. I interpret the claim, however, to be a challenge to defendant's refusal to deal with Daewoo America once the assets had been purchased.

[Daewoo America] with an insolvent shell with no Daewoo vehicles or parts to distribute." Am. Compl. ¶ 122. GMDAT can only be responsible for the supposed "debts and liabilities" if Daewoo Korea's obligation to deliver cars to Daewoo America did not terminate with the transfer of its assets to GMDAT.

The Eleventh and Fourteenth Claims allege that Daewoo America has been unable to obtain vehicles to distribute because GM excluded it from the assets it acquired via the MTA. Am. Compl. ¶ 145, 163. According to Daewoo America, its inability to obtain Daewoo automobiles, coupled with the defendants' subsequent sale and distribution of "rebadged" Daewoos, constructively terminated the Distribution Agreement and Daewoo America's franchise agreements with its dealer network. This is only problematic, of course, if GM has some obligation to assist Daewoo America perform its contracts.

Finally, in the Thirteenth Claim, Constructive Termination of the Distribution Agreement, Daewoo America contends that GM's conduct, as described throughout the Amended Complaint, terminated the Distribution Agreement and its ability to receive and distribute Daewoo vehicles. "GM's illegal conduct caused [Daewoo America] to suffer pecuniary loss or to be otherwise adversely affected, by virtue of the fact that [its] distribution agreement was discontinued, cancelled, not renewed, modified or replaced." Cutting off its supply

53

of Daewoo automobiles may have injured Daewoo America, but it is only tortious if Daewoo America had a right not to be injured. Stated differently, unless GM's decision to exclude Daewoo America from the United States Daewoo distribution network denied Daewoo America a right it had to be part of that network, GM's conduct was not tortious.

Daewoo America's right to receive Daewoo vehicles from Daewoo Korea and distribute them in the United States was created by the Distribution Agreement. Accordingly, that agreement is the only basis on which Daewoo America can legitimately claim it has any right to a continuing supply of vehicles.[24]

In Daewoo America's view, "[n]othing in the contract supports . . . a reading" that it "had the exclusive U.S. distribution rights to a vehicle model only so long as that model was manufactured by [Daewoo Korea]." Brief of Appellant at 31-32. Daewoo America observes that "the Distribution Agreement conferred on [it], for ten years, the rights not only (1) to serve as the United States distributor of the Covered products;[25] and (2) to do so exclusively, but also (3) to receive a supply of the Covered products needed to carry out its role as the exclusive U.S.

---

[24] Daewoo America's Cartwright Act claim relies on the presumption that GM (or GMDAT) had a statutory obligation to use Daewoo America as a distribution channel. Anything else would be an unreasonable restraint on trade. I simply disagree.

[25] The term "Covered products" is one of Daewoo America's own creation, and is intended to denote any vehicles manufactured in the Daewoo Korea Plants over which Daewoo America claims distribution rights. The term appears nowhere in the Distribution Agreement.

54

distributor." Id. at 31. Daewoo America also rightly points out that "the Distribution Agreement broadly prohibited [Daewoo Korea] from permitting third parties to sell the Covered products in the United States or otherwise circumventing [Daewoo America]'s exclusive distribution rights." Id. at 32-33.

That the Distribution Agreement contains these rights and obligations is not disputed by the defendants. This, however, is not the question. Rather, the question is whether Daewoo Korea either promised not to sell the Daewoo Korea Plants if the prospective buyer refused to assume its responsibilities under the Distribution Agreement or, alternatively, whether Daewoo Korea guaranteed that Daewoo America would be provided with vehicles and parts regardless of who owned the Daewoo Korea Plants. The answer rests on the definition of two key terms in the Distribution Agreement: "Seller" and "Product."

The plain language of the Distribution Agreement designates Daewoo Korea as the "Seller" of "Products," and Daewoo America as the "Buyer" and exclusive United States distributor of those Products. The term "Seller" refers solely to Daewoo Korea; it makes neither specific nor general reference to any other entity of any kind. Daewoo America argues that its rights cannot be limited solely to "Seller's" Products because "[t]he Distribution Agreement does not state that [Daewoo America] will have exclusive U.S. distribution rights 'so long as the

55

Products are manufactured by [Daewoo Korea]' or 'so long as the Products bear the 'Daewoo' trademark.'" Id. at 32. This argument is belied by the language of the agreement: "Seller is the exclusive worldwide distributor of the Products (as defined in Section 1), which are manufactured by Seller." Doc. 144, Ex. 7 (emphasis added). Daewoo America essentially argues that Daewoo Korea intended to impart distribution rights to vehicles not mentioned in the Distribution Agreement, which Daewoo Korea did not manufacture, and over which Daewoo Korea exercised no control, simply because the Distribution Agreement does not state otherwise. This assertion is nothing if not incredible.

The Distribution Agreement defines the term "Products" as "the motor vehicles provided on Exhibit A attached hereto (as said Exhibit A may be amended from time to time by Seller to add or delete motor vehicle models) and the parts, accessories and equipment therefor." Although the parties neglected to attach Exhibit A to the Distribution Agreement, nothing in this definition or the remainder of the Distribution Agreement suggests that the Products will be provided by anyone other than the Seller (namely, Daewoo Korea). It is to these Products that Daewoo America's exclusive distribution rights attach, and no others; the agreement does not address other brands or types of vehicles, nor does it make reference to other manufacturers.

In sum, the plain language of the Distribution Agreement contains no guarantee that Daewoo America would continue to receive Products after Daewoo Korea ceased manufacturing them, nor does the agreement restrict Daewoo Korea's ability to sell its manufacturing assets. Again, Daewoo Korea's assets are not mentioned in the agreement at all. To the extent Daewoo America's claims rely on the existence of such guarantees, they must fail.

B.

According to the First Claim for fraud, GM falsely represented that it would continue the Daewoo distribution relationship Daewoo America enjoyed with Daewoo Korea. Daewoo America believes that GM made this false promise to "encourage [it] not to take any action that might interfere with GM's acquisition plans." Am. Compl. ¶ 68. To be clear, Daewoo America does not allege that GM specifically offered to engage Daewoo America as the exclusive United States Daewoo distributor in exchange for Daewoo America's acceptance of the MTA or the Modified Plan; such an allegation appears nowhere in the Amended Complaint. Rather, Daewoo America simply claims that it abandoned its right to "oppose the acquisition" in reasonable reliance on GM's supposed misrepresentations.

Analyzing the terms of the Distribution Agreement does not lead to the conclusion that Daewoo America had any right to prevent Daewoo Korea from

57

selling its assets to GM.  As already shown, the Distribution Agreement neither expressly nor impliedly provides Daewoo America with any rights respecting the disposition of Daewoo Korea's property.  Moreover, Daewoo America has offered no theory, legal or otherwise, on which the court could infer the existence of such a right.  As such, Daewoo America cannot prove that GM's alleged misrepresentations caused it any harm.  It cannot show that, even if it had opposed the asset sale, the Korean bankruptcy court would have ruled differently.[26]  Accordingly, Daewoo America's fraud claim cannot stand.

IV.

I share the court's view that Daewoo America is simply attempting to return itself to its former position as exclusive United States Daewoo distributor, in complete disregard for the time and substantial effort that the Korean bankruptcy court expended in managing Daewoo Korea's reorganization.  Nevertheless, it is patently clear that the court, like the district court, rushed into abstention, dismissing Daewoo America's Amended Complaint in its entirety when, in fact, the international comity doctrine has only limited application.  I believe such judicial expediency to be unnecessary, especially considering that "[f]ederal courts

---

[26]  Daewoo America's other claimed harms, including its lost opportunity "to cover its positions and/or explore[] other business" ventures, Am. Compl. ¶ 69, are simply too vague. See Fed. R. Civ. P. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.").

have a 'virtually unflagging obligation' to exercise the jurisdiction conferred upon them." Turner Entm't Co. v. Degeto Film GmbH, 25 F.3d 1512, 1518 (11th Cir. 1994) (quoting Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817, 96 S. Ct. 1236, 1246, 47 L. Ed. 2d 483 (1976)).  I would therefore analyze the claims presented by Daewoo America and, because they lack substance, dismiss them.